<pre>
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2

 3   ━━━━━━━━━━━━━━━━━━━━━━━━━━

     PAR PHARMACEUTICAL, INC.,       CIVIL ACTION NUMBER:
 4   PAR STERILE PRODUCTS, LLC,
     and ENDO PAR INNOVATION          3:18-cv-14895-BRM-DEA
 5   COMPANY, LLC,
                                      MARKMAN HEARING
 6        Plaintiffs,

 7        v.

 8   SANDOZ, INC.,

 9        Defendants.
     ━━━━━━━━━━━━━━━━━━━━━━━━━━
10          Clarkson S. Fisher Building & U.S. Courthouse
            402 East State Street
11          Trenton, New Jersey  08608
            January 21, 2020
12          Commencing at 9:32 a.m.

13   B E F O R E:            THE HONORABLE BRIAN R. MARTINOTTI,
                             UNITED STATES DISTRICT JUDGE
14
     A P P E A R A N C E S:
15

16        DECHERT, LLP
          BY:  ROBERT D. RHOAD, ESQUIRE
17        502 Carnegie Center, Suite 104
          Princeton, NJ  08540
18        For the Plaintiff

          DECHERT, LLP
19        BY:  MARTIN J. BLACK, ESQUIRE
               BRIAN M. GOLDBERG, ESQUIRE
20             SHARON K. GAGLIARDI, ESQUIRE
          Cira Centre, 2929 Arch Street
21        Philadelphia, PA  19104
          For the Plaintiff

22

23          Megan McKay-Soule, Official Court Reporter
                 megansoule430@gmail.com
24                  (215)779-6437

25   Proceedings recorded by mechanical stenography; transcript
          produced by computer-aided transcription.
</pre>

1  **A P P E A R A N C E S**:

2      HILL WALLACK, LLP
       BY:  ERIC ABRAHAM, ESQUIRE
3           NAKUL SHAH, ESQUIRE
       21 Roszel Road
4      Princeton, NJ  08540
       For the Defendant
5
       BRINKS, GILSON & LIONE
6      BY:  LAURA LYDIGSEN, ESQUIRE
            MARK REMUS, ESQUIRE
7      455 North Cityfront Plaza Drive
       Suite 3600
8      Chicago, IL  60611
       For the Defendant
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held in open court before The Honorable
 2       BRIAN R. MARTINOTTI, United States District Judge, on January,
 3       21, 2020, at 9:32 a.m.)
 4              THE COURT:  Okay.  Good morning, everyone.  You may
 5       be seated.
 6              MR. BLACK:  Good morning, Your Honor.
 7              THE COURT:  Counsel, your appearances for the record.
 8              MR. RHOAD:  Good morning, Your Honor.  Robert Rhoad
 9       from Dechert, LLP here on behalf of the plaintiffs.  With me
10       here this morning is Martin Black, a colleague of mine, as
11       well as Sharon Gagliardi.
12              MR. ABRAHAM:  Good morning, Your Honor.  My name is
13       Eric Abraham from Hill Wallack in Princeton, New Jersey.  I'd
14       like to introduce the Court to my co-counsel, Mark Remus.
15              MR. REMUS:  Good morning, Judge.
16              MR. ABRAHAM:  Laura Lydigsen.  I'd also like to
17       introduce the Court to my client, Paki Banky, from Sandoz and
18       also Nakul Shah, a young associate at my firm Hill Wallack.
19              THE COURT:  Welcome.
20              MR. RHOAD:  So Your Honor is aware, our client, Guy
21       Donatiello, is here as well this morning.
22              THE COURT:  Welcome.  You're going to go visit Judge
23       Arpert after this, I believe.
24              MR. BLACK:  Yes, sir.
25              THE COURT:  What did we block out?  Two hours?
```

```
 1            THE DEPUTY COURT CLERK:  Yes, sir.

 2            THE COURT:  So I have read everything over the

 3    weekend, twice.  This is your hearing.  I'll let you proceed

 4    as you see fit.

 5            MR. BLACK:  Thank you, Your Honor.

 6        Martin Black.  I think what we'd like to do is we have

 7    four terms, and we've agreed to argue term by term.  So I will

 8    start by addressing just to give you a little brief background

 9    information and then jump into the first term, administering,

10    and then they'll respond to that and then we'll ping-pong back

11    and forth.

12            THE COURT:  Why shouldn't I follow in Judge

13    Connolly's well-reasoned decision?

14            MR. BLACK:  Well, Your Honor, since he ruled in our

15    favor I believe that you should.  I believe that you should.

16            THE COURT:  Okay.

17            MR. BLACK:  So I also think it's an easy one in the

18    sense that if you just look at claim 16 of the -- I'll jump

19    right to it.  Hold on a second.

20        So the core of Sandoz's argument is really on this

21    slide here, which is -- which shows their -- they have a

22    number of statements in their brief where they say that

23    there's no reference to dilution anywhere in the claim.  These

24    claims say nothing about dilution.  There is not mention of

25    dilution or IV drip while the patents are silent on dilution.
```

1   But I guess claim 16 says the pharmaceutical composition is

2   diluted in a diluent.  And what they've really done is try to

3   raise the same argument in Delaware just without using the

4   word "dilution," and we think on its face, the claims show

5   that that is not correct.

6        If we go back and look generally just at how this

7   product is administered, vasopressin comes in a vial.  It is

8   stored -- the claims require storage for four weeks,

9   refrigerated conditions when it's needed, typically in an

10  emergent situation where a doctor needs to raise the blood

11  pressure quickly, it's injected into an IV bag and then

12  administered to a patient at a particular rate.

13       THE COURT:  Talk to me about why it was only

14  mentioned in the '239 and nowhere else.

15       MR. BLACK:  Sure, Your Honor.  The '239 is limited to

16  dilution.  The other patents are not limited.  So there is a

17  -- I'll call it a core case, a rare situation where the drug

18  can be administered right out of the bottle with a syringe.

19  It doesn't make any sense in the context of these claims which

20  require administration at a very particular rate of .1 to 1

21  unit per minute.  You can't sit there with a syringe and

22  administer something at a rate.  A human being doesn't do

23  that.  And the evidence is that this particular drug is almost

24  always administered in diluted form.

25       So what the claim says is it has a -- the first part of

1   the claim -- the first part of the claim discusses the

2   characteristics of the product.  Let me just give you the

3   right number slide.  We are on slide 12.

4       So this is the structure of the claim.  It's '526,

5   claims 1, dependent claim 16 to 19.

6       It's a method for increasing blood pressure, and it has

7   several steps.  The first step is providing a pharmaceutical

8   composition for intravenous administration, and then it has a

9   number of parameters.  The concentration.  It has acetic acid.

10  It has water.  It has a pH of 3.8, and that's what you get in

11  the vial.  Then the second step is storing the composition at

12  2 to 8 degrees celsius for four weeks in the refrigerator.

13  And then the third step is actually in claim 16 which says

14  diluted in a diluent prior to administration.  And then the

15  fourth step is intravenously administering where the

16  administration is at a particular rate, not a particular

17  concentration.

18      So the whole claim fits together and the patent

19  specification discusses exactly this.  It talks about the

20  method and how you perform the method.  It's a method of

21  administration.  There's nothing in the patent that explicitly

22  discusses this unusual case where you inject it directly.

23  It's just -- it's known in the specification.  It's discussed.

24  And the one example given of how to administer it is dilution

25  in an IV bag.  And we also submitted evidence indicating that

1    that's the way it's done in the real world.  So people reading

2    the specification would understand that you can either dilute

3    or not dilute.  The important thing is that the medicine gets

4    into the patient.  It's a little like somebody said take an

5    Alka-Seltzer.  You don't just swallow one.  You put it in the

6    water, let it dissolve, and then drink the solution.  That's

7    what doctors know.  That's what their specification describes.

8              THE COURT:  I understand your argument on this point.

9              MR. BLACK:  Thank you.

10             THE COURT:  Counsel, why shouldn't I follow Delaware?

11             MR. REMUS:  The reason you should not follow Delaware

12   is that the claim construction that Sandoz is advancing is

13   materially different from the claim construction that Eagle

14   advanced and that Judge Connolly ruled on.  On this slide,

15   this is slide 8, Your Honor.  This is Eagle's construction

16   that they proposed.  It is identical to Sandoz's construction

17   except in one very important way, and that's the red

18   parenthetical.  Eagle asked Judge Connolly to expressly hold

19   that the claim does not cover dilution before administration.

20   Sandoz's construction is completely silent regarding dilution.

21   Importantly, it does not exclude dilution.  I want to explain

22   this because I think it's a very important point for framing

23   this dispute.

24             So if we go to slide 6, you've seen our construction

25   words.  I think sometimes it helps to see it in images and how

1    this is administered in the real world.

2         Sandoz's construction is very straightforward, and that

3    is for all of these claims that require administering, you

4    have to administer the formulation having the properties that

5    are required in the claim.

6         And so if we go to -- for example, this is claim 1 of

7    the '209 on slide 5, you'll see the green highlighted subject

8    matter are the three specific properties that are required for

9    the formulation.  One of those properties -- we see this come

10   up frequently -- is a specific concentration of vasopressin.

11   Here, it's .01 to .07 milligrams per milliliter.  So if we

12   take that and go to the real world application, what Sandoz's

13   saying is when that formulation is administered to the

14   patient, when it's put into that patient's vein, it has to

15   have that concentration that's expressly stated in the claims.

16        Now, what about dilution?  We'll go to slide 7.  This

17   is how Sandoz's construction applies to dilution.  If you take

18   a bottle of vasopressin, for example, which is showing that

19   bottle on the left, dilute it with dextrose or saline,

20   whatever you want, and then administer it to a patient, that's

21   fine.  Sandoz's construction does not exclude that.  But if

22   you do that, you still need to have the concentration of

23   vasopressin that's required in the claims.

24        So you can dilute all you want, but you still have to

25   meet the elements in the claims.

1    That is something that Judge Connolly never ruled on.

2 He focused his attention on whether you should exclude or

3 include dilution.  He did not rule on this issue of requiring

4 the formulation to have the properties required in the claim.

5 So in that regard, this Court is writing on a blank slate.

6    Now, I want to contrast Sandoz's construction with

7 Par's construction.  And this is on slide 9 and just a graphic

8 representation of how their construction applies in the real

9 world.  Par says, starting on the left, you can start with a

10 bottle of vasopressin that has that claimed concentration of

11 .01 to .07 milligrams per milliliter.  You dilute it and then

12 you get a completely different concentration that you

13 administer to the patient.  In that regard, they're completely

14 ignoring the concentration that's required in the claims

15 because the concentration that's actually administered to the

16 patient is different than what's in the claim.  Sandoz submits

17 that's wrong.  It's ignoring the plain meaning of the words.

18    One thing that Mr. Black just mentioned that I want to

19 make clear is -- let me go to the next slide -- the

20 specification.  I believe Mr. Black said -- so we're on slide

21 18 now -- what slide 18 shows is exemplary embodiments from

22 the '223 patent.  One embodiment is an embodiment that does

23 not mention dilution.  The other embodiment is one that

24 expressly mentions dilution.  And we compare and contrast

25 these two on the screen where in green we've highlighted the

1    properties of the formulation.  In yellow it's the

2    administering step.

3         The same holds true for the dilution embodiment where

4    green is the unit dosage form properties, light green are the

5    diluted unit dosage form properties.  And if you look at that

6    light green highlighting, you'll see that the step is diluting

7    the unit dosage form in a diluent to provide a concentration

8    from about .1 to about 1 unit per milliliter.  Then it

9    specifically says by way of milligrams, .21 micrograms to

10   about 2.1 micrograms.  So a much different concentration than

11   what is present in the unit dosage form.

12        Here they're specifying these are two completely

13   different families of embodiments.  And if we look at the

14   *Haemonetics* case as an example, the federal circuit explained

15   when you have one set of embodiments that tracks one set of

16   claims, and another set of embodiments that tracks another set

17   of claims, such as the '239 patent, you should not conflate

18   the two.  Unit dosage form means something different from

19   diluted unit dosage form.

20        Mr. Black's comments about the specification describing

21   -- I believe he said referred to an IV bag -- not true.  You

22   are not going to find any description of an IV bag, an IV

23   push, a syringe pump anywhere in the specification.  Instead,

24   the description of the embodiment is identical between the

25   embodiments with no dilution and the embodiments with

1    dilution.  And we've heard example to -- slide 18 again -- the

2    highlighted and yellow orange color, it's the exact same level

3    of detail for each embodiment.  It simply says either

4    administering the pharmaceutical composition to the human or

5    administering the diluted unit dosage form to the human.

6         So that dilution embodiment is not providing any

7    additional detail.  It's the exact same level of detail.  The

8    only difference is what's the concentration of vasopressin in

9    that formulation?  The dilution embodiment is not just a more

10   specific example of a general embodiment.  It's a completely

11   different embodiment.  The reason why that is, there are

12   different concentration ranges.

13        And I think that comes into play also when we look at

14   -- I'm at slide 16 now.  Slide 16 is a comparison of claim 1

15   of the '526 patent to claim 1 of the '239 patent.  Again, same

16   highlighting structure where the properties are highlighted in

17   green, the diluted properties are highlighted in light green.

18   And the point I want to make here is that claim 1 of the '239

19   is not just a more specific example or a narrower version of

20   claim 1 of the '526 patent.  It's a completely different

21   embodiment because it has different concentrations.  If claim

22   1 of the '239 was simply a more narrow version, you could not

23   infringe the '239 patent without also infringing the '526, but

24   that's not the case.  Because it has a different concentration

25   range, one can infringe the '239 but not infringe the '526.

1    So they don't have this relationship where it's just more

2    specificity.  Completely different embodiments, Your Honor.

3         One thing that Par really relies heavily on in its

4    briefs that I strongly disagree with is this notion of a

5    preferred embodiment.  There's nothing in the specification

6    that describes any of these embodiments as more preferred than

7    another.  The word "preferred" literally doesn't appear

8    anywhere in the hundreds of pages of these patents.  They're

9    all treated equally, and the specification makes clear some

10   embodiments are protected by some claims, other embodiments

11   are protected by yet other claims.

12        Par relies a great deal, almost exclusively, on claim

13   differentiation as one of its strongest arguments.  We cited

14   the case law in our briefs.  Your Honor has read them.  But

15   the federal circuit has made clear when you look at claim

16   differentiation, you can't let the dependent claim tail wag

17   independent claim dog.  And that's exactly what Par is doing

18   in this instance.

19           THE COURT:  How?  How does the '239 wag the dog?

20           MR. BLACK:  Because each claim, on its face, has its

21   plain ordinary meaning.  Claim 1 of the '239, Your Honor,

22   slide 16, specifically defines the properties of the

23   formulation that is administered to the patient.

24        '526 again specifically defines the properties of the

25   formulation that's administered to the patient.

1    So if you're going to somehow read the '526 patent

2  claim 1 as covering administration of a diluted product,

3  you're changing the plain meaning because you're no longer

4  administering the concentration required in claim 1 of the

5  '526.  You're now administering a completely different

6  concentration, and that's rewriting the claims.  And that's

7  what Judge Dyk, in the *Baxalta* case specifically said you

8  can't do.  He said, the court, the federal circuit has also

9  made clear that this rule of construction does not govern

10  where the independent claims on their face are of a more

11  limited scope.  And that's what we have in all of these

12  patents.  The claims are very clear on their face what the

13  concentration is that must be administered to the patient.

14    Last thing I want to touch on, Your Honor, is the role

15  of expert testimony here.  Expert testimony cannot be used to

16  vary the plain meaning of the terms.  Expert testimony can aid

17  construction but it cannot rewrite the claims.  The situation

18  we have here is very similar to the situation that was present

19  in the *Chef America v. Lamb-Weston* case.  This is summarized

20  on our slide 20.

21    The Chef America case concerned a claim directed to a

22  method of baking bread where you bake the dough to a

23  temperature of 400 degrees or more.  The problem there is if

24  you bake bread to a temperature over 400 degrees it's burnt to

25  a crisp.  It's a lump of charcoal.  So in that case they

1    brought an expert in that says, well, we know that's what the

2    claims say, but we have an expert that says everyone knows

3    you're baking it at that temperature, not to that temperature.

4         And that's exactly what Par's doing in this case.

5    Notwithstanding the plain meaning of the claims, they say,

6    well, we have this expert and he says, well, everybody knows

7    that this is what you actually do in clinical practice, but

8    that's not what the claims said.  You can't rely on expert

9    testimony to rewrite the plain meaning of the claims.

10        We think the claims are plain on their face, and we ask

11   the Court to adopt the construction where the properties

12   required in the claim are part of this claim construction.

13             THE COURT:  Thank you.

14             MR. BLACK:  Thank you, Judge.

15             THE COURT:  Talk to me about concentration and

16   embodiments.

17             MR. REMUS:  Yes, Your Honor.

18        If you look at their slide 18, you have that up there,

19   what he said was that the embodiment on the right reflects the

20   diluted form.  And element C is diluting the unit dosage form

21   to a certain number of units, which is .21 micrograms per

22   milliliter to about 2.1 micrograms per milliliter.  That's

23   what he says is the embodiment including dilution.  And you'll

24   note that the dosage form begins at a concentration of .01

25   milligrams per milliliter to about .07.  It's then diluted

 1   down to .21 -- the little "u" is microgram -- to about 2.1

 2   microgram.  He says that's an example of dilution, which is

 3   consistent with our theory.

 4       Now, they filed their brief.  We didn't get a chance to

 5   file a reply.  But if you'd like to take a look at slide 20,

 6   Your Honor, of our presentation, you'll see in the claim set,

 7   which is attached to the '526 claim 1, the dependent claims.

 8   And claim 16 says the composition is diluted in the diluent.

 9   That's the original composition at .01 to .07.  Then claim 17,

10   which we didn't get to address because of the way the briefing

11   went, says, wherein the composition is diluted to another

12   concentration, .21 micrograms to 2.1 micrograms, which is the

13   example he gave in his presentation as something which is

14   diluted.

15       So you start in the vial with something at a particular

16   concentration in claim 1.  It sits in a refrigerator for four

17   weeks.  You take it out.  You dilute it in claim 16.  And you

18   dilute it to a specific concentration stated here.  And we can

19   prove that's what happens.

20       Their theory is that, no, this claim set can only be

21   met if you keep the concentration at the original .01 to .07

22   and you have to measure it at the time that you are actually

23   -- lead the IV bag in the patient.  That's not what this claim

24   set reflects.  By his own admission, the specification, the

25   embodiment here that was intended by the patentee, was the one

 1    with full dilution.

 2          Now, these claims -- some of the claims can be read on

 3    both.  The point is you have to get what's in the vial, you

 4    have to administer it and get it into the patient.  The vast

 5    majority of the time you're going to be diluted.  Sometimes

 6    you don't.  That's very rare.  And the claims that talk about

 7    -- and almost all of them do -- about administering it to the

 8    patient at a particular rate per minute really do reflect the

 9    fact that this is something which is being administered

10    through an IV bag because people cannot sit there with a

11    syringe and administer something that deals with blood

12    pressure at a rate that -- human beings just don't do that.

13    So those of skill in the art understand that.

14          But the most important thing is, from a textual

15    perspective, we've got claims right here that involve

16    dilution.  They cover the embodiment.  There's no difference

17    between their construction here and the one in Delaware.  All

18    they did was remove the parenthetical, which at least the

19    Eagle folks were honest enough to put into the -- to the

20    construction so that the Court would understand what everybody

21    was talking about.  They've taken that out and it just has

22    kind of a tautology now.  It just says it's administered

23    according to the concentrations in the claim.  It's not

24    helpful.  It's the same argument.  Thank you.

25          THE COURT:  Last word.

```
 1          MR. RHOAD:  I'll be brief, Judge.

 2          First of all, his comments about administering a higher

 3   concentration of vasopressin, it's possible.  We submitted the

 4   declaration from Dr. Coralic that discloses exactly how one

 5   would go about doing it.  So it is possible to practice the

 6   claimed invention.  Where I think Your Honor ultimately needs

 7   to come out in considering all this evidence is Your Honor has

 8   to weigh the various evidence.  No one piece is dispositive.

 9   We certainly think the plain meaning of the claims is most

10   important.

11          Mr. Black and Par keep beating the claim

12   differentiation drum.  They have their cases where they say

13   claim differentiation controls.  We have our cases that say it

14   doesn't control.  At the end of the day, claim differentiation

15   is just an aid.  It's not conclusive.  It's one thing to

16   consider in the context of all the evidence.  Sandoz submits

17   when Your Honor considers the plain meaning of the claims, the

18   specification and the prosecution history, that evidence shows

19   that Sandoz's construction is the correct one, rather than

20   Par's construction, which relies simply on the claim

21   differentiation.  Thank you.

22          THE COURT:  Thank you.

23      Next term.

24          MR. RHOAD:  Good morning, Your Honor.  Bob Rhoad for

25   the plaintiffs.
```

```
 1          The next term we had lined up here is the term
 2    vasopressin.
 3             THE COURT:  Okay.
 4             MR. RHOAD:  And so if we look at the parties'
 5    proposed constructions, Par's proposed construction is
 6    arginine vasopressin as described as a particular sequence ID
 7    number, and Sandoz's is ordinary construction.  That's the --
 8    our proposed construction is the one that the parties
 9    stipulated to in Delaware.  So it's the one that governs in
10    Delaware and was not disputed in that case.  So Judge Connolly
11    didn't make an affirmative ruling on the merits.  It was just
12    accepted that that's the concentration.
13          So what's really the difference between the two?  As
14    far as we can tell, the difference is, first of all, whether
15    or not it is arginine vasopressin, which is vasopressin that
16    is found in humans, or lysine, or does it also include things
17    like lysine vasopressin, which is a type of vasopressin found
18    in pigs.
19          The second part is whether or not what's required is
20    that it be synthetically prepared as opposed to naturally
21    derived.  So those are really the two areas as a practical
22    matter where our --
23             THE COURT:  What is defined in the ID?
24             MR. RHOAD:  Arginine.  Synthetic arginine
25    vasopressin.  So --
```

1          THE COURT:  And it's referenced.

2          MR. RHOAD:  Yes.  Yes.

3          So at the end of the patents there's roughly four pages

4    or so of these sequence listings, and that's a way for them to

5    specifically define, when they're referring to various

6    compounds, what exactly those substances are.  And the very

7    first one is vasopressin which is sequence ID number 1.

8          And throughout the specification, they specifically

9    refer to vasopressin by way of its sequence ID number.  So on

10   our slides we have a number of references.  It says

11   vasopressin is a known peptide illustrated below sequence ID

12   number one.

13         Again, later on in the specification it says,

14   vasopressin and degradation are listed in table one below.

15   Table 1 below shows vasopressin sequence ID number 1.

16         Again, in table 3, it says it details the chemical

17   formula and structure of vasopressin and the tested

18   impurities.  Again, it's by way of reference to sequence ID

19   number one.

20         And, again, later on, vasopressin is a white amorphous

21   powder.  The structural form of vasopressin is sequence ID

22   number 1.  So throughout the specification, they're referring

23   to vasopressin by way of a sequence listing, and that's the

24   whole reason why they put it in there, was to make clear when

25   they're talking about vasopressin for purposes of the claimed

1    invention, they're talking about what's listed in the

2    sequence.

3        So you go from there to do they identify it

4    specifically as arginine vasopressin?  And in the sequence

5    listing, you see there on slide 38, it gives a sequence

6    listing and I put a box around Arg.  And that's indicating --

7    that's what makes this arginine vasopressin is the existence

8    of that Arg amino acid there.  If this was lysine vasopressin,

9    for example, that would be an Lys instead of an Arg.

10       We also see it earlier in the patent where it says it's

11   illustrated below sequence ID number 1 and they give the

12   chemical structure.  And, again, at the bottom we put a box on

13   slide 39 around the Arg.  And, again, that's indicating that

14   it's arginine vasopressin.  Again, if that was lysine

15   vasopressin, that would be an Lys that would be shown there.

16       And, again, the table that we looked at earlier all

17   reference arginine vasopressin.  So table 3, it specifically

18   says, arginine vasopressin AVP.  That's arginine vasopressin.

19   Again, in the chemical structure that appears again later,

20   sequence ID number 1, it has the Arg instead of the Lys

21   indicating that it's arginine vasopressin.  It's also in table

22   1.  So it's throughout the specification they made clear that

23   it's arginine vasopressin.

24       The sequence listing also makes clear it's

25   synthetically derived vasopressin.  So if we go to sequence ID

1    number 1, it says on slide 43, where we include the sequence

2    listing, Organism:  Artificial sequence.  Other information:

3    Description of artificial sequence:  Synthetic peptide.

4         So it's making clear that this is something that's

5    synthetically derived as opposed to something that is derived

6    from natural origins.

7         So there's no dispute that vasopressin occurs naturally

8    in the human body.  And there's a portion of the specification

9    in the background section where they're just explaining how it

10   works in the body and it notes that that's the case.  But when

11   they're talking about the compound that they're claiming, when

12   they're talking about the claimed invention and what's going

13   into the various compositions that they're claiming, they do

14   so by reference to the sequence listing, and the sequence

15   listing makes clear that it's synthetic arginine vasopressin.

16        On slide 44 we again have a reference where they're

17   specifically referring to synthetic.  It's talking about how

18   you can formulate this into a composition.  And it's

19   consistent with the USP for vasopressin which makes clear that

20   it's referring -- when it's referring to vasopressin for

21   purposes of USP vasopressin, that it's prepared synthetically

22   and it's arginine vasopressin.  So their arguments are it

23   doesn't -- there's no expressed definition that says

24   vasopressin -- by the term vasopressin we mean X, but it

25   doesn't have to be -- there's no rigid formulas that's

```
 1   required.  If you make clear in the specification that's what
 2   you're referring to, then that's -- you can provide your own
 3   definition that way.
 4        And, you know, their argument is that they say the word
 5   "synthetic" only appears twice in the specification.  That's
 6   not true.  And, most importantly, it appears specifically in
 7   the sequence ID listing so that makes clear that that is
 8   synthetic vasopressin.
 9           MS. LYDIGSEN:  Good morning, Your Honor.
10           THE COURT:  Good morning.
11        So what happened in Delaware with this term?
12           MS. LYDIGSEN:  There was no dispute in Delaware.
13   Eagle agreed to Par's proposal in Delaware, and we think the
14   reason for that is because -- the reason that we're fighting
15   about this, which only came to light recently, is that there
16   is a prior art Lithuanian patent that discloses a formulation
17   that uses naturally occurring arginine vasopressin.  So we
18   believe that plaintiffs sought this construction in Delaware,
19   knowing about that reference, and got Eagle's agreement.  It
20   doesn't explicitly spell out in their construction that
21   they're trying to limit it to synthetic.  That came out in the
22   meet and confer process in this case.
23        So we think that that's why they're trying to seek this
24   construction to exclude synthetic arginine vasopressin and try
25   to distinguish themselves from that prior art reference and we
```

1    don't think that that's proper.

2         In general we agree with Par about what vasopressin's

3    ordinary meaning is.  It's the active pharmaceutical

4    ingredient in both Par's Vasostrict product and Sandoz's

5    generic product that are subject to its ANDA.  And the term is

6    used in the scientific literature to refer to two different

7    forms of vasopressin, which are shown on this slide.  The

8    arginine vasopressin, which has an arginine vasopressin at the

9    eighth amino acid sequence.  You see those complicated

10   molecules on the right.  Oftentimes with peptides, we instead

11   describe them in terms of the sequences, which is a little bit

12   simpler, and then the only difference we see between that and

13   the vasopressin that occurs in some animals is that there's a

14   lysine at the 8th position.  Both are vasoconstrictors and

15   they occur naturally in animals but can be synthesized.

16        Mr. Rhoad went through what the various limitations

17   are.  I spelled them out here.  We think the most important

18   one and the crux of the parties' dispute is actually with

19   respect to that first limitation that they're trying to read

20   into the claim, which is whether or not the vasopressin is

21   synthetic.

22        The second thing that they attempt to read into the

23   term vasopressin is that it has to be limited to sequence ID

24   number 1.  We don't think that's as material to the parties'

25   dispute, but we also think that that is improper in this case.

1    And then third Par --

2             THE COURT:  Why?  What would that improper?

3             MS. LYDIGSEN:  Let me -- there's a couple reasons.

4         So when you look at the claim itself, this is just

5    exemplary.  This is the '239 patent.  Vasopressin is used in

6    all the claims.  It doesn't list the sequence ID there, right?

7    It just refers to vasopressin generically.  Then if you go to

8    the dependent claimants, frequently they do require specific

9    ID numbers 2, 3, 4.  So when Par intended to limit the claims

10   to a specific sequence ID, they did so.  They did not do that

11   with vasopressin.  Instead they used the term broadly.

12   There's a reason for this.  The regulations that govern how

13   patent claims are drafted in this area in peptides require

14   that if you're going to claim a specific sequence ID number,

15   you need to include that magic language in your claim sequence

16   ID.  It's not enough, according to the regulations, which is

17   reproduced here at 37 CFR section 1.821, to just refer back to

18   something with specification.  You need to actually state the

19   sequence ID number.  They did not do that here.  So it's

20   improper to read that into the claim.

21        I'd like to turn back to the first issue, though, which

22   is whether or not vasopressin should be limited to synthetic

23   vasopressin.  Before I do that, turn to -- their construction

24   refers to columns 25 and 26 of the patent specification, and

25   they draw out arginine synthetic, sequence ID number 1, from

1    these two columns, which are reproduced on this slide.  What's

2    missing in those two columns and the subsequent sequence ID

3    number 1 listing is anything that says vasopressin means,

4    vasopressin is defined as, anything that would qualify as

5    lexicography, a clear definition.  That's what's needed under

6    patent law under the federal circuit law in order to define a

7    term, is something narrower than its ordinary meaning, which

8    in this case would cover both natural and synthetic

9    vasopressin, lysine, arginine, and for some variation of

10   sequence ID.

11        The other thing that's problematic about the reliance

12   on reading these limitations in from columns 25 and 26 is that

13   what it says in the specification itself, far from having

14   limiting language, that these passages actually begin with the

15   title "embodiment" and state that the following

16   non-embodiments provide illustrative examples of the

17   invention, but do not limit the scope of the invention.

18        And so rather than attempting to limit the scope of

19   vasopressin to specific features -- synthetic, arginine,

20   sequence ID number 1 -- the specification says just the

21   opposite, that it's a nonlimiting embodiment.

22        The specification with respect to -- is also clear that

23   more than synthetic vasopressin is encompassed.  This is early

24   on in the specification.  It states that vasopressin is

25   synthesized as a prohormone in neurosecretory cells of the

1    hypothalamus.  That's a part of the brain.  So in other words,

2    the specification states that vasopressin is made by the

3    brain.  It's made naturally.  They're very -- the patent

4    specification does not state it needs to be synthetic or is

5    necessarily synthetic.

6         They rely on several passages that describe synthesis

7    of arginine vasopressin.  This is the primary one.  It says,

8    vasopressin is a polypeptide hormone that causes contraction

9    of the vascular and other smooth muscles and antidiuresis,

10   which can be formulated as a sterile aqueous solution of

11   synthetic arginine vasopressin.  The key thing there is it

12   says it can be formulated, not that it is formulated or

13   exclusively formulated.

14        Other places in the patent specification state just the

15   opposite, that it's naturally occurring.  This is also

16   consistent with the extrinsic evidence that vasopressin is not

17   limited to synthetic vasopressin.  I reproduced an excerpt

18   from the USP, the US Pharmacopeia, which is a compendium with

19   -- that's used by folks in the field, medical field, and it's

20   from the same year as the section that they rely on.  This is

21   for vasopressin injection, and it specifically states that

22   vasopressin injection includes products of animal origin.  And

23   then in that second highlighted passage, there's a

24   parenthetical that says it's animal or synthetic.  In other

25   words, it can be naturally occurring or synthetic.  And so a

1    person with ordinary skill in the art would understand based

2    on the specification and their knowledge of the field,

3    including the USP, that vasopressin is not necessarily

4    synthetic vasopressin.

5         I'd like to briefly turn to the third limitation they

6    attempt to read into the claim, which is that vasopressin

7    should be limited to arginine vasopressin.  Again, the

8    specification says that the vasopressin can be formulated as

9    arginine vasopressin, not that it necessarily is.

10        And if we look at the extrinsic evidence, this comes

11   from another version of the USP, here it says vasopressin

12   injection expressly lists both the sequence and name for

13   arginine vasopressin as well as lysine vasopressin under the

14   same heading for vasopressin injection.

15        And so lysine vasopressin would be encompassed within a

16   person of ordinary skill's understanding of the term

17   vasopressin.

18        And then finally -- this is a prior art article from

19   Treschan.  And here the author describes that vasopressin

20   should be specifically called arginine vasopressin, AVP, to

21   distinguish it from analogs.  And so when the person of

22   ordinary skill in the art wanted to refer to specifically

23   arginine vasopressin, they did so.  They would describe it as

24   arginine vasopressin.  The claims do not do that here, and

25   there's nothing in the patent specification that specifically

1   would qualify as lexicography that might limit those -- the

2   ordinary meaning of the claims.

3        THE COURT:  Thank you.

4        Counsel.

5        MR. RHOAD:  Your Honor, I just want to respond quickly

6   to three of the points that counsel raised.

7        The first one relates to the regulation from the CFR,

8   which they have on their page 58, slide 58.  And the

9   regulation specifically contemplates that the identification

10  of the sequence ID number can occur in the specification or

11  the claims.  It says, Reference must be made to the sequence

12  by use of the sequence identifier preceded by sequence ID

13  number in the text of the description or claim.

14       So their assertion that somehow the fact that it

15  doesn't say sequence ID number 1 in the claims somehow

16  violates this regulation is just wrong.  And that's the whole

17  point of including a sequence ID number listing and

18  identifying vasopressin by way of sequence ID number 1, was to

19  make clear that that's what they're referring to.

20       The second thing I wanted to talk about was their

21  reference to the embodiments, and they cited in their slide 52

22  a reference -- in column 25 -- to being nonlimiting

23  embodiments.  And they say somehow that precedes the sequence

24  ID listings as if the sequence ID numbers are somehow part of

25  the embodiments.  That's just a separate -- the portion they

1    cite is not relevant to the sequence ID listings which are

2    simply at the end of the patent they included sequence

3    listings.  So that portion of the specification they cited has

4    nothing to do with the sequence listings.

5          Finally, on the USP, they cite the references to

6    labeling in the USP and labeling it as natural or synthetic.

7    And that just refers to the fact that the USP makes clear --

8    USP vasopressin is synthetic arginine vasopressin.  And it

9    makes clear that if you're going to use some other form of

10   vasopressin, you have to make it clear on the label so

11   nobody's confused.  That simply confirms our assertion that

12   everybody understands when you're talking about vasopressin,

13   you're talking about synthetic arginine vasopressin in

14   accordance with the USP.  They cite an earlier version that

15   included within USP vasopressin lysine vasopressin, but that

16   had changed by the time of the claimed invention.  So the

17   relevant inquiry is at the time of the claimed invention.  By

18   that time the USP had dropped lysine and everybody understood

19   USP vasopressin is synthetic arginine vasopressin.

20         MS. LYDIGSEN:  I don't think I have much more to say.

21   We stand by our reading of the regulation which states it has

22   to refer to the specific sequence ID number.  And with respect

23   to the USP, the portion that was cited initially in our slides

24   comes from the same edition as theirs.  Nothing changed.  That

25   was current as of 2015 referencing both animal and synthetic

1    vasopressin.  Thank you.

2         THE COURT:  Number 3.

3         MR. RHOAD:  Your Honor, the next term that we have

4    identified for construction is the "consists essentially of"

5    term.  And it's one of the transitional phrases that's

6    recognized for use in patent claims.  It's kind of unusual.

7    It's not used a lot, but it has a clear and ordinary meaning

8    which is that, you know it's between comprising which allows

9    you to have all the things that were cited plus anything else

10   and "consists of" which says you can only have the recited

11   ingredients.  And sort of in between those two, you have to

12   have the recited ingredients, but you can also have other ones

13   so long as they don't materially affect the basic and novel

14   characteristics of the claim.  We think it's that ordinary

15   meaning that should apply.

16        Just for -- kind of orient ourselves, this transitional

17   phrase appears in only one of the patents, the '478 patent and

18   claim 1 of the '478 patent.  So this term is limited in terms

19   of its impact to that one particular patent and the claims

20   that are found in here.

21        As I said, you know, this term has it's well understood

22   meaning and so the recited components of the unit dosage form

23   in claim 1 are three things.  You have the vasopressin or a

24   pharmaceutically acceptable salt thereof, which plays into

25   what we'll talk about in a minute, and has an acetate buffer

1    and water.  So under this transitional phrase you have to have

2    those three things, and you can include other ingredients so

3    long as they don't materially affect the basic and novel

4    properties of the invention.

5           So when you use this type of transitional phrase, the

6    federal circuit has told us it really raises two questions for

7    the Court to consider in terms of doing an infringement or

8    validly analysis.  The first is what are the basic and novel

9    characteristics of the claimed inventions.  So that's sort of

10   the first question.  The second question is does the

11   particular unrecited ingredient that's either in the accused

12   product or the prior art formulation at issue, does it

13   materially affect those?

14          So the first question, what are the basic and novel

15   properties, that really is a claim construction question

16   regarding what's the scope of the claim, what are those basic

17   and novel characteristics?

18          That second question, though, is one -- it's an

19   infringement question for the fact-finder to determine.  Okay.

20   You know, you have this particular additional unrecited

21   element.  Is that something that materially affects the basic

22   and novel characteristics and properties of the claimed

23   invention?

24          So the issue here is we just say ordinary meaning.

25   Sandoz argues that this phrase is indefinite.  They want to

1    invalidate the claim saying it's indefinite, saying people of
2    ordinary skill have no idea what you're talking about.  They
3    can't understand the scope of this claim.  It's indefinite.
4         So the first issue is what's the standard for
5    indefiniteness?  Since they're trying to invalidate the claim
6    as indefinite, it's different than the normal claim
7    construction.
8         THE COURT:  When should that be done, here or later?
9         MR. RHOAD:  In our view it would make more sense to
10   do it later when the Court has full expert testimony.  This is
11   going to be a bench trial so we don't have to worry about jury
12   confusion or anything like that.
13        THE COURT:  How about that case that was cited in
14   their brief, the recent federal circuit case?
15        MR. RHOAD:  So that case says it's part of claim
16   construction and we're not disputing that.  It's up to -- if
17   Your Honor wishes to do it now, we're happy for Your Honor to
18   do this question of this first, what are the basic and novel
19   characteristics of the claim?  Courts -- district courts have
20   discretion to manage their docket any way they want.  You
21   don't even have to hold a Markman hearing.  You don't have to
22   do claim construction before trial.  You can do it whenever
23   you want.  So it's up to Your Honor's discretion when you
24   believe is the best time.  We're not saying you can't do it
25   now or you have to do it later.

1          THE COURT:  Do I have everything I need to do it now?

2          MR. RHOAD:  I think you do.  I think you can make --

3    answer the first question, what are the basic and novel

4    characteristics?  I think you have what's needed.  I think

5    it's clear from the specification and the prosecution history

6    and the intrinsic evidence what those properties are.

7          So I think you have what you need at the moment.

8    Obviously after trial or at some point in the trial you'll

9    have more expert testimony.  You'll have a better

10   understanding of the compositions at issue and you might be a

11   little bit more informed in making a decision at that point.

12   But I think you have enough to make the call right now.

13         THE COURT:  All right.

14         MR. RHOAD:  But I think the important thing is from

15   burden of proof and the standards applicable here, we're not

16   talking about normal claim construction where -- from a --

17   where you're deciding something, you know, based upon your

18   view of the evidence and intrinsic evidence and whatnot.

19         THE COURT:  What is the standard to do that?

20         MR. RHOAD:  The standard, first of all, is -- for

21   indefiniteness, standards would have to prove that the claims

22   failed to inform those of skill in the art about the scope of

23   the invention with reasonable certainty.  So that's what we

24   have from the Supreme Court *Nautilus* case.  That's the general

25   standard for indefiniteness.  But what's clear is that this is

1    an invalidity defense.  So like all invalidity defenses in

2    accordance with the *Microsoft* Supreme Court case, Sandoz has

3    the burden of proving indefiniteness by clear and convincing

4    evidence.  That's a heavy burden of persuasion and the law is

5    also clear in terms of the standards for indefiniteness.  The

6    fact that there's some imprecision involved doesn't mean that

7    it's indefinite.  You can use relative terms.  And the fact

8    that there is some imprecision involved doesn't mean that a

9    claim is indefinite.

10        And here, in our view, Sandoz, clearly failed to meet

11   their burden.  The relevant perspective is a person of

12   ordinary skill in the art -- would the claims inform a person

13   of ordinary skill in the art about the scope of the claims

14   with -- to a reasonable degree of certainty, and they have no

15   expert evidence on this point.  They have no expert coming in

16   here saying I can't understand this claim.  It doesn't tell me

17   about the scope of this claim with reasonable certainty.

18   There is no evidence from an expert to that point.  They're

19   relying entirely on lawyer arguments.

20        They cite no case in which a patent was invalidated on

21   indefiniteness without some form of expert testimony.  The

22   principal case they relied on in their reply brief is this

23   recent federal circuit case, and that explicitly relied on

24   expert evidence and experts who came in and said we can't

25   understand -- we can't determine the scope of these claims for

1    X, Y and Z reasons, and the courts found that persuasive and

2    found invalidity on the basis of that expert testimony.  So in

3    our view, they have failed as a matter of law by not providing

4    the requisite evidence to establish clear and convincing

5    evidence of invalidity.

6         But let's take a look at -- so the first question under

7    this recent federal circuit case is what are the basic and

8    novel properties of the claimed invention?

9         When we talk about that in the context case, the

10   claimed invention is clearly directed to vasopressin

11   compositions that are intravenously administered to patients

12   to treat hypotension.  It's a pharmaceutical product.  It's

13   used to treat patients for a particular condition that's

14   expressly recited in the claims in this instance of this

15   particular patent.

16        You know, so the patentees didn't claim to be the first

17   people ever to invent vasopressin, but what they did say is

18   they described the problems that existed with the existing

19   vasopressin formulations at the time.  And what they said is,

20   hey, vasopressin degrades in aqueous solutions.  So you put it

21   in water and it starts to degrade and the degradation gets

22   worse over time.  So that's a problem when you're formulating

23   these kinds of compositions.  And they said the then current

24   formulations had poor long-term stability.  And then in the

25   rest of the spec, they described a bunch of experiments they

1    did, testing they did to various things and what can impact

2    stability and the amount of vasopressin.  And during the

3    prosecution history there was back and forth about it and they

4    pointed to the stability of the product at the particular pH

5    that they claimed and said that's what differentiates us.

6    That's what makes us novel and patentable over the prior art.

7            And they expressly -- on slide 56 we have a statement

8    by them where they specifically describe the advantages that

9    they provide.  It says they provide advantages in stability,

10   administration, and efficacy as well as formulation viscosity.

11   And so our proposal -- so we set forth a position as to what

12   we assert are the basic and novel characteristics of the

13   claimed invention.  Sandoz has not offered any list of what

14   they are.  They just say they can't possibly know what it is.

15   And so on slide 57 we set forth the four things that we say

16   together comprised the basic and novel characteristics.

17   Stability, that addresses -- that relates to the problem they

18   identified and the advantage they identified in stability.

19   It's also pharmaceutical acceptability.  This has to be a

20   product that's suitable for use as a pharmaceutical product.

21   Effectiveness in treating hypotension.  That's what this is

22   about.  It's treating patients who have -- hypotension is low

23   blood pressure.  So what happens, people come to the hospital,

24   they're in septic shock, really blow blood pressure, it needs

25   to be raised.  That's part of what these inventions are about.

1    Then suitability for intravenous injection in particular.

2    That's what they're talking about.  So we identified those

3    four things.

4         Sandoz makes essentially three arguments.  The

5    intrinsic evidence doesn't identify those things, these

6    properties, and I'll touch base on that.  That's just not the

7    case.  It's not true.  We'll talk about that in a minute.

8    They say the properties are not novel.  That's an invalidity

9    argument that these are invalid under '102 and '103, that

10   these aren't novel.  That's for another day.  That's when --

11   there's no expert here saying this isn't novel stuff.  In

12   terms of whether or not they're novel, that's for another day.

13        And I say the properties cannot be understood with

14   reasonable certainty.  And that really goes to the second

15   question when you're talking about whether something

16   materially affects one of these properties.  And that's a time

17   for infringement and invalidity.  That's not something, at

18   least in the circumstances of this case, that we say can be

19   addressed right now.

20        So in terms of that first question, the first argument,

21   what are the properties, you know, they have this, I find it

22   somewhat remarkable, statement that we quote on page 59.  They

23   say, Only one of the four properties identified by Par even

24   appears in this sentence -- stability.  And they're referring

25   to a sentence we had on slide 56 where it's describing the

1    advantages.  Okay.  And they say, Only one of them appears in

2    the advantages.  I'm at a loss to understand their argument

3    because it mentions stability, but it also means that it's

4    pharmaceutically acceptability.  So on slide 60 the sentence

5    says, Embodiments of pharmaceutical formulations that provide

6    advantages.  So it's clearly referring to pharmaceutical

7    products.  Products that have to be acceptable for use in a

8    pharmaceutical product.

9          The sentence next we identify was effectiveness in

10   treating hypotension.  Specifically one of the advantages

11   referred to is efficacy.  Efficacy is effectiveness and

12   hypotension is mentioned specifically in the claims.  So the

13   efficacy we're talking about for purposes of this claim is

14   hypotension.

15         Suitability for intravenous injection.  It specifically

16   references in that sentence "administration."  That's the form

17   of administration that they're talking about, intravenous

18   injections.  So all four are expressly referenced in that

19   sentence.  The intrinsic evidence makes clear that it's those

20   four.  It's also provided elsewhere throughout the

21   specification.

22         Stability, as I noted, is described as the problem,

23   described as an advantage, and the -- the specification

24   includes extensive discussion of that and the prosecution

25   history is what made it patentable.

1      Pharmaceutical acceptability.  Again, these are

2  pharmaceutical products.  They have to be -- acceptable for

3  use in pharmaceutical products.

4      Effectiveness in treating hypotension.  Again, that's

5  right in the claims.

6      Intravenous injection.  There's extensive discussion of

7  diluting intravenous injection.  That's the form of

8  administration.

9      Now -- and then -- so that's the first argument that's

10  throughout the intrinsic evidence.  We believe it's clearly

11  identified.

12      The second argument about novelty, there's no evidence

13  it's not novel.  There's no expert out here, and this isn't

14  the right time to decide that.  We believe they are novel and

15  the patent office found that they were novel.

16      The final argument is that the properties themselves

17  are somehow indefinite.  That really goes to the second

18  question whether or not if you add something, it would have a

19  material effect on these properties.  They submitted no expert

20  evidence on that issue at all, and there's no basis for the

21  Court to conclude on this record that there's anything

22  indefinite about those four things.  If you think about it

23  practically, it seems clear and obvious to me that a person of

24  ordinary skill in the art would understand this.

25  Pharmaceutical acceptability.  If I add something, that means

1   you can't inject it into a human.  The FDA includes a list of

2   ingredients that are acceptable in pharmaceutical products.

3   Well, if you add something that's going to be toxic to

4   somebody so it's no longer pharmaceutically acceptable, that's

5   materially affecting the basic novels of -- and properties of

6   this -- of this product.  It has to be pharmaceutically

7   acceptable.  And experts would know whether things affect

8   suitability for that.

9        Effectiveness.  It's efficacy in treating hypotension.

10  Again, experts can figure out whether something materially

11  affects its efficacy.  And that should be no problem.

12       Suitability for intravenous injection.  Again, if you

13  add something that makes this a gel or a solid, it can no

14  longer be injected.  That's clearly materially affecting it.

15  It seems readily apparent.  Stability, you add something that

16  adversely affects the stability, it's going to be known.  They

17  simply can't prove that these claims are indefinite.

18       THE COURT:  Do you agree with counsel regarding the

19  standard that the Court needs to employ at this juncture and

20  who has the burden?

21       MS. LYDIGSEN:  Yes.  Sandoz has the burden of proof

22  by clear and convincing evidence.  We believe that exists here

23  based on the specification itself, however, and there's no

24  need for expert testimony.  Their own patent specification

25  makes -- fails to disclose the basic and novel properties with

1    sufficient clarity for a person of ordinary skill to identify

2    them.

3            THE COURT:  Who tells me that?

4            MS. LYDIGSEN:  Who tells you that?

5            THE COURT:  Yes.  You?

6            MS. LYDIGSEN:  It should be apparent from the

7    specification.  It should be reading the specification.

8    There's no reason why we need an expert mouthpiece to read the

9    patent specification.

10           THE COURT:  To say what a POSA would interpret this

11   or how a POSA would read that, I don't need an expert for

12   that?

13           MS. LYDIGSEN:  Not for identification of the basic

14   and novel properties.  You should be able to read the patented

15   claims and specification and pick out those properties with

16   some level of certainty.  It should not take a Ph.D. degree to

17   be able to determine what those properties are.

18           Here's the parties' construction side by side.  Par

19   says that the term "consists essentially" should be given its

20   ordinary meaning and then has a long parenthetical with those

21   four properties.  Sandoz's position is that the term is

22   indefinite as used in claim 1 of the '478 patent, which would

23   also render the dependent claims, the 2 through 11, indefinite

24   and knock out that entire patent.

25           This is just consists -- Mr. Rhoad already went through

 1    some of it.  It's a transitional phrase that appears after the

 2    preamble of the claim and before the body which lists the

 3    elements.  Here the preamble recites a method of using a unit

 4    dosage form and then it uses the transition "consists

 5    essentially of" and there's elements A, B, and C.

 6         As Mr. Rhoad mentioned, there are several different

 7    types of transitional phrases.  I've listed the three common

 8    ones here in the description from the MPEP about them.  The

 9    open transitional phrase, which Your Honor's probably seen

10    before, is comprising.  And so with a comprising transition,

11    the claim would cover anything that has the recited elements

12    and additional elements.  If you looked at claim 1, if it had

13    a comprising transition that consists essentially of, the unit

14    dosage form could include elements A, B, and C and anything

15    else.

16         But Par didn't claim it that way.  They chose a more

17    closed transitional phrase, "consists essentially of," and

18    that limits the scope of the claim to the specific materials

19    or steps and those that do not materially affect the basic and

20    novel characteristics of the claimed invention.  That's not

21    only from the MPEP but from the case law.  The *HZNP* decision

22    from the federal circuit last fall that Your Honor cited

23    quotes to earlier cases that recited that the phrase

24    "consisting essentially of" permits inclusion of components

25    not listed in the claim, provided they do not materially

1    affect the basic and novel properties of the invention.

2         And that case provided some very helpful guidance on

3    how to deal with "consists essentially of" at the claim

4    construction stage.  We generally agree with Par there's a

5    two-step inquiry.  Number one, you have to be able to identify

6    the basic and novel properties that go with that "consists

7    essentially of" transition.  And then once those properties

8    are identified, there has to be an assessment of whether or

9    not they're definite.

10        Under 35 U.S.C. Section 112, paragraph B, the basic and

11   novel properties must be sufficiently definite to inform with

12   reasonable certainty a person of ordinary skill of their scope

13   within the context of invention.

14        So looking at -- I want to direct Your Honor's

15   attention to the bottom five lines there in Par's

16   construction.  That's where the -- the properties that they

17   contend that the basic and novel properties are laid out.

18   Stability, pharmaceutical acceptability, effectiveness in

19   treating hypotension and suitability for intravenous

20   injection.  And this is the passage of the patent

21   specification that Par pointed to at column 15 starting at

22   line 26 that they say lists the properties.  It's featured

23   heavily in Mr. Rhoad's presentation.  Here it is side by side

24   with the four properties that they've identified.

25        Mr. Rhoad for the first time is now saying that he can

 1    carve out -- stability is the only one that appears there

 2    verbatim.  He says, well, you would actually -- a person of

 3    ordinary skill would actually understand administration of

 4    efficacy to -- and breach the three other three properties

 5    that he lists, but for reasons that are unexplained still,

 6    they would ignore that fourth property that's listed in the

 7    patent specification, modulation of formulation of viscosity.

 8         I think that that position is a little bit problematic

 9    because their own patent -- it's very vaguely stated at column

10    15 that says administration and efficacy, not pharmaceutical

11    acceptability, not effectiveness in treating hypotension, not

12    suitability for intravenous injection.  And anybody, a person

13    of ordinary skill or otherwise, reading a patent specification

14    would understand that they don't specifically recite only

15    effectiveness in treating hypotension.  If you go to column --

16         THE COURT:  Who tells me that?  I mean, I'm certainly

17    not a POSA, and don't I need somebody to say what a POSA would

18    say or how a POSA would read that?  And isn't that your burden

19    to prove that?

20         MS. LYDIGSEN:  But it's in the patent specification,

21    and here it's at column 4 of the '478 patent.  When you're

22    talking about -- they say it's effectiveness in treating

23    hypotension and that the person of ordinary skill would read

24    "efficacy" to mean that.  But if you --

25         THE COURT:  Who is the person of ordinary skill?  Me?

 1           MS. LYDIGSEN:  It's not you, Your Honor, but this is

 2      about reading the patent specification, and this is not

 3      something that would require a higher level of ordinary skill

 4      to pick out what they're claiming in their patent

 5      specification what the basic and novel properties are.

 6           THE COURT:  Do you agree with that?

 7           MR. RHOAD:  Your Honor, I think it requires -- to the

 8      extent it requires expert evidence, to the extent there's any

 9      ambiguity or that the specification needs it.  And, in fact,

10      we're talking about hypotension.  It's in the claim itself,

11      so --

12           THE COURT:  Okay.  Counsel, I cut you off.  I'm

13      sorry.

14           MS. LYDIGSEN:  We have a collection of cases that are

15      cited in our opening brief at page 18 where the basic and

16      novel property identification is done based on the patent

17      specification.  And that was also what we've done on the *HZNP*

18      decision.  I'm going to skip out of order here for a minute

19      and show you what the court relied on in *HZNP* to identify the

20      basic and novel properties.  This is what the federal -- the

21      federal circuit found that they were sufficiently identified

22      there and they looked at the patent specification.  It was not

23      based on expert testimony.  The judges looked at the patent

24      specification.  In that case they were clearly spelled out.

25      There were five headings, one for each property that was

1    verbatim what the plaintiff contended those properties were in

2    that case.  And under each heading there was a description of

3    the specifics of that property.

4         That is not the case here.  What we have is a -- one

5    sentence at column 15 that's very vague that describes

6    administration, efficacy.  And then there are other portions

7    of the patent specification that describe different -- not

8    just hypotension but treating other diseases.  That's at

9    column 4, line 7.  There's a long list of other diseases.  And

10   then with respect to administration, they say that, well,

11   administration would need IV administration.  Of course a

12   person of ordinary skill would know that.  But their patent

13   specification at column 7, line 28 says pharmaceutical

14   composition can be administered in therapeutically effective

15   amounts.  For example, intravenous, subcutaneous,

16   intermuscular, transdermal or parenteral administration.

17        You don't need to be a person of skill in the art to

18   understand that their patent specification is vague as to what

19   the basic and novel properties are.

20        For this type of claim, what they're trying to use is a

21   semiclosed transitional phrase, it's their -- I think that's

22   their burden to say something in the patent specification that

23   helps provide a flag post for anyone reading it to understand

24   what those properties are and what the claim means.

25        The other reason why I don't believe a person of

1   ordinary skill would identify these properties in particular

2   from column 15 is the fact that they're not novel.  This slide

3   shows one particular prior art reference from Buck and the

4   four properties that Par identifies side by side.  And with

5   respect to stability, Buck discusses the fact that there was

6   prior art, vasopressin formulations are used, and the issue

7   wasn't stability with those but whether or not they would be

8   stable when co-administered with other drugs.  There's been

9   some success with it, but it hasn't been formally studied yet.

10          With respect to Par's properties two and three which

11  relate to pharmaceutical acceptability and effectiveness in

12  treating hypotension, Buck reports a number of clinical

13  studies where vasopressin was used to treat hypotension and

14  was pharmaceutically acceptable.

15          And then finally with respect to the suitability for

16  intravenous administration, Buck said that was done in the

17  prior art too.  So we had a patent specification with some

18  vague listing of properties that aren't spelled out as basic

19  and novel properties.  Par wants you to take three of those

20  four that are listed in column 15 and extrapolate from two of

21  them to turn into three properties using other parts of the

22  patent specification in the claims and ignore the fact that a

23  person of ordinary skill would recognize that none of those

24  properties were new.  What are the novel properties?  The

25  specification does not spell them out for us.

1        But even if you can identify the basic and novel

2   properties with sufficient specificity, Par has a second

3   problem and that's at step two, whether or not those

4   properties are sufficiently definite.  And, again,

5   specification itself makes it clear that they're not definite

6   here.

7        This is the standard from -- for definiteness that was

8   spelled out in the *HZNP* decision which also involved an

9   evaluation of "consists essentially of" on a particular

10  patent.  There the court said, It follows that those basic and

11  novel properties, when read in light of the specification and

12  the prosecution history, must provide objective boundaries for

13  those of skill in the art.  The basic and novel properties

14  must be sufficiently definite so as to inform with reasonable

15  certainty a person of ordinary skill of their scope within the

16  context of the invention.

17       So there's that passage from *HZNP* side by side with the

18  four properties that Par spells out.  Now, in *HZNP* the federal

19  circuit only went through this analysis for one of the

20  properties there because they found that property was

21  indefinite.  So even if one property is indefinite, the claim

22  is indefinite.

23       So I'm just going focus on stability because that's the

24  only property that actually appears verbatim in column 15.

25  And even if that was sufficiently identified, Par has a

1  problem here because their own patent specification indicates

2  that that property is not sufficiently definite for a person

3  of ordinary skill in the art to understand the scope of the

4  claim.

5      The specification here describes numerous measures of

6  stability, and this slide shows one of those which is half

7  life.  And rather than defining an objective boundary that

8  would help a person of ordinary skill understand what level of

9  stability they believe is novel and what are the basic and

10  novel properties of the invention, this passage describes half

11  lives of one to 1,000 percent at five percent increments for

12  the first 100 percent and then 100 percent increments after

13  that.

14      Then half lives of one to 1,000 percent of another

15  formulation measured at another temperature at five to 100

16  percent increments.  Half lives of one hour to one week at one

17  hour increments for the first day and six- to 12-hour

18  increments thereafter.  Instead of claiming something narrow

19  and giving some boundaries, some benchmarks for what makes a

20  novel level of stability, the claim -- the patent

21  specification purports the invention covers every level of

22  stability.  But if there's more, the patent specification also

23  describes virtually every level of decomposition.

24      This slide shows that the patent drafters stated that

25  the inventions include 1 to 1,000 percent decomposition of

1    another formulation at five percent increments for the first

2    100 percent and 100 percent thereafter.  Temperature for

3    testing zero to 75 degrees celsius at one degree increments

4    and .1 degree increments for 20 to 25 degrees celsius

5    specifically.  Again, no benchmarks.

6         Goes on, virtually every level of purity is described

7    in the patent specification.  They claim the inventions cover

8    1 to 99 percent purity of vasopressin at .1 percent increment.

9    Virtually every level of sequence similarity with sequence ID

10   number 1 is also covered.  The same story applies there with

11   these tiny increments between different percentages and

12   virtually every mix of other peptides, ratios from 1,000 to 1

13   to 10 to 1.  And also with percentage measurements from .1 to

14   100 percent at 1 percent increments.  You don't need to be a

15   person of ordinary skill in the art to read the specification

16   and know that there's no benchmark here.  There's no

17   boundaries.  They're purporting to cover every possible level

18   of stability and yet saying it's a basic and novel property.

19        If this were not enough, they have a second problem.

20   And this slide comes from an excerpt in the '223 patent which

21   is related.  And there it describes how the stability of the

22   vasopressin formulation would vary depending on the

23   temperature that -- in which it's stored.  Here, it purports

24   that the amount of impurities observed in the sample stored at

25   25 degrees celsius and 60 percent relative humidity after 24

 1  months exceeded 13 percent in some samples where the amount of

 2  impurities observed in the samples stored at five degrees

 3  celsius do not exceed three percent after 24 months.  So you

 4  can get a ten percent variation depending on temperature.  And

 5  there's no indication in the patent specification as to how

 6  this should be tested.

 7       That was enough in *HZNP* to invalidate the claims there.

 8  The drying time -- drying time was identified as the basic and

 9  novel property, and based on the specification the Court found

10  that because there were different tests for drying time that

11  produced different results that that particular basic and

12  novel property was indefinite.

13       Now, Par's counsel says that *HZNP* is hinged on expert

14  testimony.  That was not the case.  There were expert

15  declarations put in at the Markman stage, but if you look at

16  the federal circuit decision, the federal circuit relied on

17  the patent specification alone.  That was what they weighed in

18  determining that the claims were invalid as indefinite.  And

19  here they have multiple problems both with step one and two,

20  which makes it an even stronger case for invalidity at the

21  claim construction stage.

22            THE COURT:  Okay.  Thank you.

23            MR. RHOAD:  Your Honor, just very briefly.  You know,

24  I think Your Honor hit the nail on the head asking questions

25  about who's deciding this, you know, is it you or is it an

1    expert who's telling you this?  There's no dispute that a

2    determination is going to be made based upon the intrinsic

3    evidence.  But it's how a person of ordinary skill in the art

4    reads the intrinsic evidence, not how a lawyer or a judge

5    reads that intrinsic evidence.  It's what would be understood

6    by a person of ordinary of skill in the art.

7         And so, you know, they say hypotension is not part of

8    it because it describes treatment of a variety of different

9    conditions.  Well, claim 1 that we're talking about

10   specifically refers to -- in the last line -- wherein the

11   person is hypotensive, it's very clear.  Let them come in with

12   an expert who says, I don't understand this has to be

13   effective for treating hypotension.  There's no expert saying

14   that because it's just not true.

15        They pointed out various excerpts from throughout the

16   specification regarding stability.  But there's no expert to

17   tell Your Honor that in light of those they're somehow

18   confused about what's meant by stability.  And I think their

19   presentation highlights the importance of that ex -- having an

20   expert come talk to Your Honor about that because they

21   completely ignore the prosecution history where they --

22   inventors submitted -- did testing on stability, submitted it,

23   explained to the patent office why they believed this had --

24   the particulars of this claim had advantages with respect to

25   stability and why that made it patentable over the prior art.

1  They need to come in with an expert and say not withstanding

2  all of that prosecution history and what was done there, I

3  can't understand this claim.  I don't know what they're

4  talking about with stability.  Let an expert come and tell the

5  Court that.  They're asking you to interpret, pick out bits

6  and pieces from the specification and reach a conclusion about

7  whether or not a person of ordinary skill would be able to

8  understand the claim.  That's just improper claim

9  construction, and their evidence is just woefully short of

10  meeting the standard of proof of clear and convincing

11  evidence.

12        On the notion of temperature, well, it's got to be --

13  there's no dispute that temperature has an effect on

14  stability, but when you're comparing two formulations it's got

15  to be apples to apples comparisons.  And an expert would know

16  that and an expert would understand that and would tell the

17  Court that.  That's the kind of evidence Your Honor needs.

18  Certainly, we think it's -- that is not indefinite and that

19  will be clear, but they haven't met their burden of proof.

20        THE COURT:  Counsel.

21        MR. RHOAD:  I'm sorry.  The point about the *HZNP*

22  case, the *HZNP* case expressly relied on expert evidence.  And

23  I have a copy in my bag, not present, but I can point Your

24  Honor to specific passages.  But it's very clear in the case.

25        MS. LYDIGSEN:  I don't deny that the *HZNP* case in the

1    background mentions the fact that the district court looked at

2    expert declarations, but it was not relied on by the federal

3    circuit.  Unless Your Honor has more questions, I have nothing

4    further.

5         THE COURT:  Thank you.

6         Last but not least.

7         MS. GAGLIARDI:  Good morning, Your Honor.  Sharon

8    Gagliardi on behalf of plaintiffs.

9         The last term for construction is where impurities are

10   determined based on a specified HPLC method.  The dispute

11   here, Par's construction is that the term should be supported

12   as plain and ordinary meaning and no construction is required

13   whereas Sandoz contends that this claim limitation is --

14   requires a step be performed in terms of -- to determine

15   impurities as part of the active infringement.

16        It's implicated in two claims, the '209 claim 11 the

17   '785 claim 2.  I wanted to start with the '785 claim 2, which

18   is a composition claim.  An independent claim requires --

19   recites a pharmaceutical composition and then it has

20   comprising several components of that composition.  It

21   requires vasopressin.  It has the fact that the composition

22   contains impurities.

23        The dependent claim, claim 2, which is the claim that

24   contains the disputed limitation, says that the impurities

25   contain a plurality of peptides, that there's a number of

 1   impurities.  And then it specifies a test that you can use to

 2   determine whether infringement has occurred.

 3        This is not a method claim.  This is a composition

 4   claim, and it's -- the test here is describing a test to

 5   determine whether specified impurities are present.

 6        The method claim, which is the method of treatment

 7   claim, '209, claim 11 --

 8             THE COURT:  Talk to me about your widget.

 9             MS. GAGLIARDI:  My widget.  The widget.  So the

10   analogy we give is a widget that if you had a claim to a

11   widget that had a mass of 10 kilograms, right?  You know, if

12   you sell a widget that has a mass of 10 kilograms, you sell

13   the widget, it has that mass.  You can determine that it has

14   that mass and it infringes the claim.

15        If I specify in my dependent claim that, hey, I have a

16   widget.  It has a mass, and I'm going to determine that mass

17   using a specified skill, right?  The infringing act is making

18   and selling the widget that has those properties, that has a

19   mass of 10 kilograms.  And the dependent claim is just

20   specifying the kind of evidence that I would need to put

21   forward to meet my burden of proof of a preponderance of the

22   evidence that it is more likely than not that it has this mass

23   using this scale.

24        It's not a step that -- it's not a method step that has

25   to be performed as part of the act of selling the product or

1    using the product.  Here, the nature of the HPLC test, if you

2    understand how the test that -- I have a slide that shows what

3    HPLC is.  This is high-performance liquid chromatography, and

4    this is a technique used in a chemistry lab to separate,

5    identify, and quantify components of a formulation.  So here

6    you have vasopressin.  As we discussed, it degrades.  And you

7    have impurities present and we're trying to quantify and the

8    intention is limiting the number of impurities here that are

9    present.  And so this is a technique where we can determine

10   what impurities there are and how much of them there are.

11        And so you have -- if my laser pointer would work --

12   over here you have -- you start out in the that first box,

13   number one, you have solvents that are the mobile phase, what

14   we call the mobile phase, that are mixing in with the -- a

15   pump draws them in.  There are components and you put your

16   sample in there and it goes through a column and in the

17   column, the stationary phase allows you to separate out the

18   different components and identify them and then it goes into a

19   waste container.  So if you're talking about a method of

20   treating a patient with hypotension and you have a person of

21   ordinary skill of how these claims are understood, if they're

22   treating a patient who is sitting in a hospital needing urgent

23   care, they're not going to be part of that method of treating

24   a patient, running to a chemistry lab, running an HPLC test

25   for 55 minutes and determining whether these impurities are

1   present.  The impurities are just part of the composition

2   that's being sold.

3          So here our position is just that these are describing

4   the nature of these impurities in a test to determine whether

5   these properties are present.

6          THE COURT:  Why is Sandoz's construction nonsensical?

7          MS. GAGLIARDI:  I think it's nonsensical because -- I

8   don't think -- reading them in the context of how a person of

9   ordinary skill would understand them.  And so like I said,

10  somebody that's treating a patient isn't going to be thinking

11  that I can run to the lab, determine these impurities and get

12  waste and go back and deliver that waste to a human.

13         THE COURT:  Okay.

14         MS. GAGLIARDI:  Thank you.

15         MR. REMUS:  Judge, Sandoz's position on this term is

16  very similar to its position on administering terms, and that

17  is the claims mean what they say.  And here the disputed

18  claim, claim 11 of '209 and claim 2 of the '785 specifically

19  say the impurities are determined "based on."  Not that they

20  can be determined or it's capable of determining, but they are

21  determined.  So that language is very clear.  And that's

22  solely what Sandoz asked the Court to adopt for its claim

23  construction.

24         If we look at the comparison of claim 1 and claim 2 of

25  the '785 that Ms. Gagliardi also referred to, it drives home

1   how important it is that one actually practiced the claimed

2   HPLC method to infringe.  That's because if we look at claim 1

3   of the '785 patent -- this is on slide 44 highlighted in

4   green, it's the same color scheme as the administering

5   terms -- we have the properties of the formulation that's

6   being administered.  It spells out exactly what the impurities

7   are.

8        Then in claim 2, highlighted in yellow, we have the

9   HPLC method.  If claim 2 simply means that it's capable of

10  determining those impurities, it does not further limit claim

11  1.  Claim 2 is now superfluous.  If you don't have to practice

12  that method, then claim 2 adds nothing and you're limited to

13  claim 1.  And there's a presumption that claim 2 should add a

14  further limitation, that that claim should have meaning.  And

15  that's consistent with what we see in the specification.

16       On slide 45 we highlight at least six examples from the

17  '209 patent.  I won't go through all six examples.  The Court

18  has the benefit of the examples in the slide deck in our

19  brief, but the point is throughout the specification the

20  inventors described the HPLC method as something that is

21  actually performed, not something that simply can be

22  performed.

23       So on that, Your Honor, we think the claim language is

24  clear.  We ask the Court to require that to infringe those

25  claims, one has to actually perform the HPLC method.  Thank

1   you.

2          MS. GAGLIARDI:  I would submit that claim 2 does add

3   something.  It addresses the required proof that you need to

4   show that that limitation is met.  Here we're talking about a

5   difference between the active infringement and the proof

6   required to establish infringement.  Thank you.

7          MR. REMUS:  Your Honor, very briefly, I was just

8   reminded I forgot to mention one thing.  On Your Honor's

9   question about the nonsensicality argument, we think that's

10  been disclosed at this point in time.  Under Sandoz's claim

11  construction the claims are absolutely capable of being

12  infringed.  It's not a situation where to test you have to

13  destroy an entire batch.  If you want to test it, you take a

14  sample out of a commercial batch, you test that sample.  The

15  rest of the batch is perfectly fine.  It's not destroyed.  So

16  Sandoz's construction is not nonsensical.  Thank you.

17         THE COURT:  Anything further?

18      So my thought of moving forward is to permit counsel to

19  submit not more than ten pages, a written closing argument.

20  Is that acceptable?

21         MR. REMUS:  Yes, Your Honor.

22         MR. BLACK:  Yes, Your Honor.

23         THE COURT:  How long do you need to do that?  There

24  will be simultaneous submissions.

25         MR. BLACK:  Ten days, Your Honor.

```
 1          MR. REMUS:  Next Friday.

 2          THE COURT:  Does that work?

 3          MR. BLACK:  That's fine.  Yes.

 4          THE COURT:  Nobody likes Kansas City or San

 5   Francisco.  I guess it's before the Super Bowl, so you're

 6   okay.

 7          MR. REMUS:  Well, I have to be careful, though, Your

 8   Honor, because Ms. Lydigsen is a huge Kansas City fan.  She

 9   has her Kansas City ski cap with her, so she will be gearing

10   up for the big game.

11          MR. BLACK:  I'm still rooting for the Eagles.

12          THE COURT:  Well, you have Randy Reid, I guess.

13          MR. BLACK:  We do.  Maybe next year.

14          THE COURT:  Is next Friday okay, or do you need more

15   time?

16          MR. BLACK:  That's fine with us.

17          THE COURT:  You okay?  Get it off your plate

18   before --

19          MR. REMUS:  Before the big game.  We can rest on

20   Sunday.

21          THE COURT:  Counsel, thank you very much.  I will

22   never forget how I spent my Martin Luther King weekend of

23   2020, and I thank you for that.  I thank you for resolving at

24   least one of the claims.  When you talk to Judge Arpert, and I

25   know you're going to be speaking with him momentarily, perhaps
```

1    you can come into an agreement on some of the other claims.

2    It seems that you're very close on at least two of the four.

3    So if you can work it out, that would be great.  If not,

4    you'll get your decision as quickly as possible.

5              MR. BLACK:  Thank you, Your Honor.

6              MR. REMUS:  Thank you, Judge.

7              (Court concludes at 10:56 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'

'102 [1] - 37:9
'103 [1] - 37:9
'209 [5] - 8:7, 54:16, 55:7, 57:18, 58:17
'223 [2] - 9:22, 50:20
'239 [11] - 5:14, 5:15, 10:17, 11:15, 11:18, 11:22, 11:23, 11:25, 12:19, 12:21, 24:5
'478 [4] - 30:17, 30:18, 41:22, 44:21
'526 [9] - 6:4, 11:15, 11:20, 11:23, 11:25, 12:24, 13:1, 13:5, 15:7
'785 [5] - 54:17, 57:18, 57:25, 58:3

**0**

01 [5] - 8:11, 9:11, 14:24, 15:9, 15:21
07 [5] - 8:11, 9:11, 14:25, 15:9, 15:21
08540 [2] - 1:17, 2:4
08608 [1] - 1:11

**1**

1 [48] - 5:20, 6:5, 8:6, 10:8, 11:14, 11:15, 11:18, 11:20, 11:22, 12:21, 13:2, 13:4, 15:7, 15:16, 19:7, 19:15, 19:22, 20:11, 20:20, 20:22, 21:1, 23:24, 24:25, 25:3, 25:20, 28:15, 28:18, 30:18, 30:23, 41:22, 42:12, 49:25, 50:4, 50:8, 50:10, 50:12, 50:13, 50:14, 52:9, 57:24, 58:2, 58:11, 58:13
1,000 [4] - 49:11, 49:14, 49:25, 50:12
1.821 [1] - 24:17
10 [4] - 50:13, 55:11, 55:12, 55:19
100 [6] - 49:12, 49:15, 50:2, 50:14
104 [1] - 1:16
10:56 [1] - 61:7
11 [4] - 41:23, 54:16, 55:7, 57:18
112 [1] - 43:10
12 [1] - 6:3
12-hour [1] - 49:17
13 [1] - 51:1

15 [6] - 43:21, 44:10, 46:5, 47:2, 47:20, 48:24
16 [9] - 4:18, 5:1, 6:5, 6:13, 11:14, 12:22, 15:8, 15:17
17 [1] - 15:9
18 [5] - 9:21, 11:1, 14:18, 45:15
19 [1] - 6:5
19104 [1] - 1:21

**2**

2 [14] - 6:12, 24:9, 41:23, 54:17, 54:23, 57:18, 57:24, 58:8, 58:9, 58:11, 58:12, 58:13, 59:2
2.1 [4] - 10:10, 14:22, 15:1, 15:12
20 [3] - 13:20, 15:5, 50:4
2015 [1] - 29:25
2020 [3] - 1:11, 3:3, 60:23
21 [7] - 1:11, 2:3, 3:3, 10:9, 14:21, 15:1, 15:12
215)779-6437 [1] - 1:24
24 [2] - 50:25, 51:3
25 [5] - 24:24, 25:12, 28:22, 50:4, 50:25
26 [3] - 24:24, 25:12, 43:22
28 [1] - 46:13
2929 [1] - 1:20

**3**

3 [4] - 19:16, 20:17, 24:9, 30:2
3.8 [1] - 6:10
35 [1] - 43:10
3600 [1] - 2:7
37 [1] - 24:17
38 [1] - 20:5
39 [1] - 20:13
3:18-cv-14895-BRM-DEA [1] - 1:4

**4**

4 [3] - 24:9, 44:21, 46:9
400 [2] - 13:23, 13:24
402 [1] - 1:10
43 [1] - 21:1
44 [2] - 21:16, 58:3

45 [1] - 58:16
455 [1] - 2:7

**5**

5 [1] - 8:7
502 [1] - 1:16
52 [1] - 28:21
55 [1] - 56:25
56 [2] - 36:7, 37:25
57 [1] - 36:15
58 [2] - 28:8
59 [1] - 37:22

**6**

6 [1] - 7:24
60 [2] - 38:4, 50:25
60611 [1] - 2:8

**7**

7 [3] - 8:16, 46:9, 46:13
75 [1] - 50:3

**8**

8 [2] - 6:12, 7:15
8th [1] - 23:14

**9**

9 [1] - 9:7
99 [1] - 50:8
9:32 [2] - 1:12, 3:3

**A**

a.m [3] - 1:12, 3:3, 61:7
able [4] - 41:14, 41:17, 43:5, 53:7
ABRAHAM [3] - 2:2, 3:12, 3:16
Abraham [1] - 3:13
absolutely [1] - 59:11
acceptability [7] - 36:19, 38:4, 39:1, 39:25, 43:18, 44:11, 47:11
acceptable [8] - 30:24, 38:7, 39:2, 40:2, 40:4, 40:7, 47:14, 59:20
accepted [1] - 18:12
accordance [2] - 29:14, 34:2
according [2] - 16:23, 24:16
accused [1] - 31:11

acetate [1] - 30:25
acetic [1] - 6:9
acid [3] - 6:9, 20:8, 23:9
act [2] - 55:17, 55:25
ACTION [1] - 1:3
active [2] - 23:3, 54:15, 59:5
add [7] - 39:18, 39:25, 40:3, 40:13, 40:15, 58:13, 59:2
additional [3] - 11:7, 31:20, 42:12
address [1] - 15:10
addressed [1] - 37:19
addresses [2] - 36:17, 59:3
addressing [1] - 4:8
adds [1] - 58:12
administer [7] - 5:22, 6:24, 8:4, 8:20, 9:13, 16:4, 16:11
administered [16] - 5:7, 5:12, 5:18, 5:24, 8:1, 8:13, 9:15, 12:23, 12:25, 13:13, 16:9, 16:22, 35:11, 46:14, 47:8, 58:6
administering [12] - 4:9, 6:15, 8:3, 10:2, 11:4, 11:5, 13:4, 13:5, 16:7, 17:2, 57:16, 58:4
administration [19] - 5:20, 6:8, 6:14, 6:16, 6:21, 7:19, 13:2, 36:10, 38:16, 38:17, 39:8, 44:3, 44:10, 46:6, 46:10, 46:11, 46:16, 47:16
admission [1] - 15:24
adopt [2] - 14:11, 57:22
advanced [1] - 7:14
advancing [1] - 7:12
advantage [2] - 36:18, 38:23
advantages [7] - 36:8, 36:9, 38:1, 38:2, 38:6, 38:10, 52:24
adversely [1] - 40:16
affect [6] - 30:13, 31:3, 31:13, 40:7, 42:19, 43:1
affecting [2] - 40:5, 40:14
affects [4] - 31:21, 37:16, 40:11, 40:16
agree [4] - 23:2, 40:18, 43:4, 45:6

agreed [2] - 4:7, 22:13
agreement [2] - 22:19, 61:1
aid [2] - 13:16, 17:15
aided [1] - 1:25
Alka [1] - 7:5
Alka-Seltzer [1] - 7:5
allows [2] - 30:8, 56:17
almost [3] - 5:23, 12:12, 16:7
alone [1] - 51:17
ambiguity [1] - 45:9
America [2] - 13:19, 13:21
amino [2] - 20:8, 23:9
amorphous [1] - 19:20
amount [3] - 36:2, 50:24, 51:1
amounts [1] - 46:15
analogs [1] - 27:21
analogy [1] - 55:10
analysis [2] - 31:8, 48:19
ANDA [1] - 23:5
animal [3] - 26:22, 26:24, 29:25
animals [2] - 23:13, 23:15
answer [1] - 33:3
antidiuresis [1] - 26:9
apparent [2] - 40:15, 41:6
appear [1] - 12:7
appearances [1] - 3:7
apples [2] - 53:15
applicable [1] - 33:15
application [1] - 8:12
applies [3] - 8:17, 9:8, 50:10
apply [1] - 30:15
aqueous [2] - 26:10, 35:20
Arch [1] - 1:20
area [1] - 24:13
areas [1] - 18:21
Arg [5] - 20:6, 20:8, 20:9, 20:13, 20:20
arginine [32] - 18:6, 18:15, 18:24, 20:4, 20:7, 20:14, 20:17, 20:18, 20:21, 20:23, 21:15, 21:22, 22:17, 22:24, 23:8, 24:25, 25:9, 25:19, 26:7, 26:11, 27:7, 27:9, 27:13, 27:20, 27:23, 27:24, 29:8, 29:13, 29:19

**argue** [1] - 4:7
**argues** [1] - 31:25
**argument** [13] - 4:20, 5:3, 7:8, 7:8, 16:24, 22:4, 37:9, 37:20, 38:2, 39:9, 39:12, 39:16, 59:9, 59:19
**arguments** [4] - 12:13, 21:22, 34:19, 37:4
**Arpert** [2] - 3:23, 60:24
**art** [22] - 16:13, 22:16, 22:25, 27:1, 27:18, 27:22, 31:12, 33:22, 34:12, 34:13, 36:6, 39:24, 46:17, 47:3, 47:6, 47:17, 48:13, 49:3, 50:15, 52:3, 52:6, 52:25
**article** [1] - 27:18
**artificial** [2] - 21:2, 21:3
**assert** [1] - 36:12
**assertion** [2] - 28:14, 29:11
**assessment** [1] - 43:8
**associate** [1] - 3:18
**attached** [1] - 15:7
**attempt** [2] - 23:22, 27:6
**attempting** [1] - 25:18
**attention** [2] - 9:2, 43:15
**author** [1] - 27:19
**AVP** [2] - 20:18, 27:20
**aware** [1] - 3:20

**B**

**background** [3] - 4:8, 21:9, 54:1
**bag** [7] - 5:11, 6:25, 10:21, 10:22, 15:23, 16:10, 53:23
**bake** [2] - 13:22, 13:24
**baking** [3] - 13:22, 14:3
**Banky** [1] - 3:17
**base** [1] - 37:6
**based** [9] - 27:1, 33:17, 40:23, 45:16, 45:23, 51:9, 52:2, 54:10, 57:19
**basic** [31] - 30:13, 31:3, 31:8, 31:14, 31:16, 31:21, 32:18, 33:3, 35:7, 36:12, 36:16, 40:5, 40:25, 41:13, 42:19, 43:1, 43:6, 43:10, 43:17,

45:5, 45:15, 45:20, 46:19, 47:18, 48:1, 48:10, 48:13, 49:9, 50:18, 51:8, 51:11
**basis** [2] - 35:2, 39:20
**batch** [3] - 59:13, 59:14, 59:15
**Baxalta** [1] - 13:7
**beating** [1] - 17:11
**begin** [1] - 25:14
**begins** [1] - 14:24
**behalf** [2] - 3:9, 54:8
**beings** [1] - 16:12
**below** [4] - 19:11, 19:14, 19:15, 20:11
**bench** [1] - 32:11
**benchmark** [1] - 50:16
**benchmarks** [2] - 49:19, 50:5
**benefit** [1] - 58:18
**best** [1] - 32:24
**better** [1] - 33:9
**between** [8] - 10:24, 16:17, 18:13, 23:12, 30:8, 30:11, 50:11, 59:5
**big** [2] - 60:10, 60:19
**bit** [3] - 23:11, 33:11, 44:8
**bits** [1] - 53:5
**BLACK** [17] - 1:19, 3:6, 3:24, 4:5, 4:14, 4:17, 5:15, 7:9, 12:20, 14:14, 59:22, 59:25, 60:3, 60:11, 60:13, 60:16, 61:5
**black** [3] - 9:18, 9:20, 17:11
**Black** [2] - 3:10, 4:6
**black's** [1] - 10:20
**blank** [1] - 9:5
**block** [1] - 3:25
**blood** [5] - 5:10, 6:6, 6:11, 36:23, 36:24
**blow** [1] - 36:24
**Bob** [1] - 17:24
**body** [3] - 21:8, 21:10, 42:2
**bottle** [4] - 5:18, 8:18, 8:19, 9:10
**bottom** [2] - 20:12, 43:15
**boundaries** [3] - 48:12, 49:19, 50:17
**boundary** [1] - 49:7
**Bowl** [1] - 60:5
**box** [3] - 20:6, 20:12, 56:12
**brain** [2] - 26:1, 26:3
**breach** [1] - 44:4

**bread** [2] - 13:22, 13:24
**BRIAN** [3] - 1:13, 1:19, 3:2
**brief** [8] - 4:8, 4:22, 15:4, 17:1, 32:14, 34:22, 45:15, 58:19
**briefing** [1] - 15:10
**briefly** [3] - 27:5, 51:23, 59:7
**briefs** [2] - 12:4, 12:14
**BRINKS** [1] - 2:5
**broadly** [1] - 24:11
**brought** [1] - 14:1
**Buck** [4] - 47:3, 47:5, 47:12, 47:16
**buffer** [1] - 30:25
**Building** [1] - 1:10
**bunch** [1] - 35:25
**burden** [10] - 33:15, 34:3, 34:4, 34:11, 40:20, 40:21, 44:18, 46:22, 53:19, 55:21
**burnt** [1] - 13:24
**BY** [4] - 1:16, 1:19, 2:2, 2:6

**C**

**cannot** [4] - 13:15, 13:17, 16:10, 37:13
**cap** [1] - 60:9
**capable** [3] - 57:20, 58:9, 59:11
**care** [1] - 56:23
**careful** [1] - 60:7
**Carnegie** [1] - 1:16
**carve** [1] - 44:1
**case** [38] - 5:17, 6:22, 10:14, 11:24, 12:14, 13:7, 13:19, 13:21, 13:25, 14:4, 18:10, 21:10, 22:22, 23:25, 25:8, 32:13, 32:14, 32:15, 33:24, 34:2, 34:20, 34:22, 34:23, 35:7, 35:9, 37:7, 37:18, 42:21, 43:2, 45:24, 46:2, 46:4, 51:14, 51:20, 53:22, 53:24, 53:25
**cases** [4] - 17:12, 17:13, 42:23, 45:14
**causes** [1] - 26:8
**cells** [1] - 25:25
**celsius** [5] - 6:12, 50:3, 50:4, 50:25, 51:3
**Center** [1] - 1:16
**Centre** [1] - 1:20

**certain** [1] - 14:21
**certainly** [3] - 17:9, 44:16, 53:18
**certainty** [7] - 33:23, 34:14, 34:17, 37:14, 41:16, 43:12, 48:15
**CFR** [2] - 24:17, 28:7
**chance** [1] - 15:4
**changed** [2] - 29:16, 29:24
**changing** [1] - 13:3
**characteristics** [10] - 6:2, 30:14, 31:9, 31:17, 31:22, 32:19, 33:4, 36:12, 36:16, 42:20
**charcoal** [1] - 13:25
**Chef** [2] - 13:19, 13:21
**chemical** [3] - 19:16, 20:12, 20:19
**chemistry** [2] - 56:4, 56:24
**Chicago** [1] - 2:8
**chose** [1] - 42:16
**chromatography** [1] - 56:3
**Cira** [1] - 1:20
**circuit** [14] - 10:14, 12:15, 13:8, 25:6, 31:6, 32:14, 34:23, 35:7, 42:22, 45:21, 48:19, 51:16, 54:3
**circumstances** [1] - 37:18
**cite** [4] - 29:1, 29:5, 29:14, 34:20
**cited** [8] - 12:13, 28:21, 29:3, 29:23, 30:9, 32:13, 42:22, 45:15
**City** [3] - 60:4, 60:8, 60:9
**Cityfront** [1] - 2:7
**CIVIL** [1] - 1:3
**claim** [128] - 4:18, 4:23, 5:1, 5:25, 6:1, 6:4, 6:5, 6:13, 6:18, 7:12, 7:13, 7:19, 8:5, 8:6, 9:4, 9:16, 11:14, 11:15, 11:18, 11:20, 11:21, 12:12, 12:15, 12:16, 12:17, 12:20, 12:21, 13:2, 13:4, 13:21, 14:12, 15:6, 15:7, 15:8, 15:9, 15:16, 15:17, 15:20, 15:23, 16:23, 17:11, 17:13, 17:14, 17:20, 23:20, 24:4, 24:14, 24:15, 24:20, 27:6,

28:13, 30:14, 30:18, 30:23, 31:15, 31:16, 32:1, 32:3, 32:5, 32:6, 32:15, 32:19, 32:22, 33:16, 34:9, 34:16, 34:17, 35:16, 38:13, 41:22, 42:2, 42:11, 42:12, 42:16, 42:18, 42:25, 43:3, 45:10, 46:20, 46:24, 48:21, 49:4, 49:20, 50:7, 51:21, 52:9, 52:24, 53:3, 53:8, 54:13, 54:16, 54:17, 54:18, 54:23, 55:3, 55:4, 55:6, 55:7, 55:10, 55:14, 55:15, 55:19, 57:18, 57:22, 57:24, 58:2, 58:8, 58:9, 58:10, 58:11, 58:12, 58:13, 58:14, 58:23, 59:2, 59:10
**claimants** [1] - 24:8
**claimed** [14] - 9:10, 17:6, 19:25, 21:12, 29:16, 29:17, 31:9, 31:22, 35:8, 35:10, 36:5, 36:13, 42:20, 58:1
**claiming** [4] - 21:11, 21:13, 45:4, 49:18
**claims** [59] - 4:24, 5:4, 5:8, 5:19, 6:5, 8:3, 8:15, 8:23, 8:25, 9:14, 10:16, 10:17, 12:10, 12:11, 13:6, 13:10, 13:12, 13:17, 14:2, 14:5, 14:8, 14:9, 14:10, 15:7, 16:2, 16:6, 16:15, 17:9, 17:17, 24:6, 24:9, 24:13, 27:24, 28:2, 28:11, 28:15, 30:6, 30:19, 33:21, 34:12, 34:13, 34:25, 35:14, 38:12, 39:5, 40:17, 41:15, 41:23, 47:22, 51:7, 51:18, 54:16, 56:21, 57:17, 58:25, 59:11, 60:24, 61:1
**clarity** [1] - 41:1
**Clarkson** [1] - 1:10
**clear** [35] - 9:19, 12:9, 12:15, 13:9, 13:12, 19:24, 20:22, 20:24, 21:4, 21:15, 21:19, 22:1, 22:7, 25:5, 25:22, 28:19, 29:7, 29:9, 29:10, 30:7,

33:5, 33:25, 34:3, 34:5, 35:4, 38:19, 39:23, 40:22, 48:5, 52:11, 53:10, 53:19, 53:24, 57:21, 58:24
**clearly** [6] - 34:10, 35:10, 38:6, 39:10, 40:14, 45:24
**CLERK** [1] - 4:1
**client** [2] - 3:17, 3:20
**clinical** [2] - 14:7, 47:12
**close** [1] - 61:2
**closed** [1] - 42:17
**closing** [1] - 59:19
**co** [2] - 3:14, 47:8
**co-administered** [1] - 47:8
**co-counsel** [1] - 3:14
**colleague** [1] - 3:10
**collection** [1] - 45:14
**color** [2] - 11:2, 58:4
**column** [13] - 28:22, 43:21, 44:9, 44:15, 44:21, 46:5, 46:9, 46:13, 47:2, 47:20, 48:24, 56:16, 56:17
**columns** [4] - 24:24, 25:1, 25:2, 25:12
**coming** [1] - 34:15
**Commencing** [1] - 1:12
**comments** [2] - 10:20, 17:2
**commercial** [1] - 59:14
**common** [1] - 42:7
**COMPANY** [1] - 1:5
**compare** [1] - 9:24
**comparing** [1] - 53:14
**comparison** [2] - 11:14, 57:24
**comparisons** [1] - 53:15
**compendium** [1] - 26:18
**completely** [9] - 7:20, 9:12, 9:13, 10:12, 11:10, 11:20, 12:2, 13:5, 52:21
**complicated** [1] - 23:9
**components** [6] - 30:22, 42:24, 54:20, 56:5, 56:15, 56:18
**composition** [15] - 5:1, 6:8, 6:11, 11:4, 15:8, 15:9, 15:11, 21:18, 46:14, 54:18, 54:19, 54:20, 54:21, 55:3, 57:1

**compositions** [4] - 21:13, 33:10, 35:11, 35:23
**compound** [1] - 21:11
**compounds** [1] - 19:6
**comprised** [1] - 36:16
**comprising** [5] - 30:8, 42:10, 42:13, 54:20
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concentration** [25] - 6:9, 6:17, 8:10, 8:15, 8:22, 9:10, 9:12, 9:14, 9:15, 10:7, 10:10, 11:8, 11:12, 11:24, 13:4, 13:6, 13:13, 14:15, 14:24, 15:12, 15:16, 15:18, 15:21, 17:3, 18:12
**concentrations** [2] - 11:21, 16:23
**concerned** [1] - 13:21
**conclude** [1] - 39:21
**concludes** [1] - 61:7
**conclusion** [1] - 53:6
**conclusive** [1] - 17:15
**condition** [1] - 35:13
**conditions** [2] - 5:9, 52:9
**confer** [1] - 22:22
**confirms** [1] - 29:11
**conflate** [1] - 10:17
**confused** [2] - 29:11, 52:18
**confusion** [1] - 32:12
**Connolly** [4] - 7:14, 7:18, 9:1, 18:10
**Connolly's** [1] - 4:13
**consider** [2] - 17:16, 31:7
**considering** [1] - 17:7
**considers** [1] - 17:17
**consistent** [4] - 15:3, 21:19, 26:16, 58:15
**consisting** [1] - 42:24
**consists** [10] - 30:4, 30:10, 41:19, 41:25, 42:4, 42:13, 42:17, 43:3, 43:6, 48:9
**construction** [45] - 7:12, 7:13, 7:15, 7:16, 7:20, 7:24, 8:2, 8:17, 8:21, 9:6, 9:7, 9:8, 13:9, 13:17, 14:11, 14:12, 16:17, 16:20, 17:19, 17:20, 18:5, 18:7, 18:8, 22:18, 22:20, 22:24, 24:23, 30:4, 31:15,

32:7, 32:16, 32:22, 33:16, 41:18, 43:4, 43:16, 51:21, 53:9, 54:9, 54:11, 54:12, 57:6, 57:23, 59:11, 59:16
**constructions** [1] - 18:5
**contain** [1] - 54:25
**container** [1] - 56:19
**contains** [2] - 54:22, 54:24
**contemplates** [1] - 28:9
**contend** [1] - 43:17
**contended** [1] - 46:1
**contends** [1] - 54:13
**context** [6] - 5:19, 17:16, 35:9, 43:13, 48:16, 57:8
**contraction** [1] - 26:8
**contrast** [2] - 9:6, 9:24
**control** [1] - 17:14
**controls** [1] - 17:13
**convincing** [4] - 34:3, 35:4, 40:22, 53:10
**copy** [1] - 53:23
**Coralic** [1] - 17:4
**core** [2] - 4:20, 5:17
**correct** [2] - 5:5, 17:19
**counsel** [11] - 3:7, 3:14, 7:10, 28:4, 28:6, 40:18, 45:12, 51:13, 53:20, 59:18, 60:21
**couple** [1] - 24:3
**course** [1] - 46:11
**Court** [19] - 1:23, 3:14, 3:17, 9:5, 14:11, 16:20, 31:7, 32:10, 33:24, 34:2, 39:21, 40:19, 51:9, 53:5, 53:17, 57:22, 58:17, 58:24, 61:7
**COURT** [52] - 1:1, 3:4, 3:7, 3:19, 3:22, 3:25, 4:1, 4:2, 4:12, 4:16, 5:13, 7:8, 7:10, 12:19, 14:13, 14:15, 16:25, 17:22, 18:3, 18:23, 19:1, 22:10, 24:2, 28:3, 30:2, 32:8, 32:13, 33:1, 33:13, 33:19, 40:18, 41:3, 41:5, 41:10, 44:16, 44:25, 45:6, 45:12, 51:22, 53:20, 54:5, 55:8, 57:6, 57:13, 59:17, 59:23, 60:2, 60:4, 60:12,

60:14, 60:17, 60:21
**court** [5] - 3:1, 13:8, 45:19, 48:10, 54:1
**Courthouse** [1] - 1:10
**courts** [3] - 32:19, 35:1
**cover** [6] - 7:19, 16:16, 25:8, 42:11, 50:7, 50:17
**covered** [1] - 50:10
**covering** [1] - 13:2
**covers** [1] - 49:21
**crisp** [1] - 13:25
**crux** [1] - 23:18
**current** [2] - 29:25, 35:23
**cut** [1] - 45:12

## D

**days** [1] - 59:25
**deal** [2] - 12:12, 43:3
**deals** [1] - 16:11
**DECHERT** [2] - 1:15, 1:18
**Dechert** [1] - 3:9
**decide** [1] - 39:14
**deciding** [2] - 33:17, 51:25
**decision** [7] - 4:13, 33:11, 42:21, 45:18, 48:8, 51:16, 61:4
**deck** [1] - 58:18
**declaration** [1] - 17:4
**declarations** [2] - 51:15, 54:2
**decomposition** [2] - 49:23, 49:25
**Defendant** [2] - 2:4, 2:8
**Defendants** [1] - 1:9
**defense** [1] - 34:1
**defenses** [1] - 34:1
**define** [2] - 19:5, 25:6
**defined** [2] - 18:23, 25:4
**defines** [2] - 12:22, 12:24
**defining** [1] - 49:7
**definite** [6] - 43:9, 43:11, 48:4, 48:5, 48:14, 49:2
**definiteness** [1] - 48:7
**definition** [3] - 21:23, 22:3, 25:5
**degradation** [2] - 19:14, 35:21
**degrade** [1] - 35:21
**degrades** [2] - 35:20, 56:6

**degree** [4] - 34:14, 41:16, 50:3, 50:4
**degrees** [7] - 6:12, 12:23, 13:24, 50:3, 50:4, 50:25, 51:2
**Delaware** [10] - 5:3, 7:10, 7:11, 16:17, 18:9, 18:10, 22:11, 22:12, 22:13, 22:18
**deliver** [1] - 57:12
**deny** [1] - 53:25
**dependent** [8] - 6:5, 12:16, 15:7, 24:8, 41:23, 54:23, 55:15, 55:19
**DEPUTY** [1] - 4:1
**derived** [4] - 18:21, 20:25, 21:5
**describe** [3] - 23:11, 26:6, 27:23, 36:8, 46:7
**described** [7] - 18:6, 35:18, 35:25, 38:22, 38:23, 50:6, 58:20
**describes** [9] - 7:7, 12:6, 27:19, 46:5, 49:5, 49:10, 49:23, 50:21, 52:8
**describing** [4] - 10:20, 37:25, 55:4, 57:3
**description** [6] - 10:22, 10:24, 21:3, 28:13, 42:8, 46:2
**destroy** [1] - 59:13
**destroyed** [1] - 59:15
**detail** [3] - 11:3, 11:7
**details** [1] - 19:16
**determination** [1] - 52:2
**determine** [11] - 31:19, 34:25, 41:17, 54:14, 55:2, 55:5, 55:13, 55:16, 56:9, 57:4, 57:11
**determined** [4] - 54:10, 57:19, 57:20, 57:21
**determining** [4] - 51:18, 56:25, 57:20, 58:10
**dextrose** [1] - 8:19
**difference** [6] - 11:8, 16:16, 18:13, 18:14, 23:12, 59:5
**different** [22] - 7:13, 9:12, 9:16, 10:10, 10:13, 10:18, 11:11, 11:12, 11:20, 11:21, 11:24, 12:2, 13:5, 23:6, 32:6, 42:6,

46:7, 50:11, 51:10, 51:11, 52:8, 56:18
**differentiates** [1] - 36:5
**differentiation** [6] - 12:13, 12:16, 17:12, 17:13, 17:14, 17:21
**diluent** [4] - 5:2, 6:14, 10:7, 15:8
**dilute** [7] - 7:2, 7:3, 8:19, 8:24, 9:11, 15:17, 15:18
**diluted** [14] - 5:2, 5:24, 6:14, 10:5, 10:19, 11:5, 11:17, 13:2, 14:20, 14:25, 15:8, 15:11, 15:14, 16:5
**diluting** [3] - 10:6, 14:20, 39:7
**dilution** [24] - 4:23, 4:24, 4:25, 5:4, 5:16, 6:24, 7:19, 7:20, 7:21, 8:16, 8:17, 9:3, 9:23, 9:24, 10:3, 10:25, 11:1, 11:6, 11:9, 14:23, 15:2, 16:1, 16:16
**direct** [1] - 43:14
**directed** [2] - 13:21, 35:10
**directly** [1] - 6:22
**disagree** [1] - 12:4
**disclose** [1] - 40:25
**disclosed** [1] - 59:10
**discloses** [2] - 17:4, 22:16
**discretion** [2] - 32:20, 32:23
**discussed** [2] - 6:23, 56:6
**discusses** [4] - 6:1, 6:19, 6:22, 47:5
**discussion** [2] - 38:24, 39:6
**diseases** [2] - 46:8, 46:9
**dispositive** [1] - 17:8
**dispute** [8] - 7:23, 21:7, 22:12, 23:18, 23:25, 52:1, 53:13, 54:10
**disputed** [3] - 18:10, 54:24, 57:17
**disputing** [1] - 32:16
**dissolve** [1] - 7:6
**distinguish** [2] - 22:25, 27:21
**DISTRICT** [3] - 1:1, 1:1, 1:13
**District** [1] - 3:2

**district** [2] - 32:19, 54:1
**docket** [1] - 32:20
**doctor** [1] - 5:10
**doctors** [1] - 7:7
**dog** [2] - 12:17, 12:19
**Donatiello** [1] - 3:21
**done** [7] - 5:2, 7:1, 32:8, 45:16, 45:17, 47:16, 53:2
**dosage** [12] - 10:4, 10:5, 10:7, 10:11, 10:18, 10:19, 11:5, 14:20, 14:24, 30:22, 42:4, 42:14
**dough** [1] - 13:22
**down** [1] - 15:1
**Dr** [1] - 17:4
**drafted** [1] - 24:13
**drafters** [1] - 49:24
**draw** [1] - 24:25
**draws** [1] - 56:15
**drink** [1] - 7:6
**drip** [1] - 4:25
**Drive** [1] - 2:7
**drives** [1] - 57:25
**dropped** [1] - 29:18
**drug** [2] - 5:17, 5:23
**drugs** [1] - 47:8
**drum** [1] - 17:12
**drying** [3] - 51:8, 51:10
**during** [1] - 36:2
**Dyk** [1] - 13:7

---

### E

**Eagle** [3] - 7:13, 16:19, 22:13
**eagle** [1] - 7:18
**Eagle's** [2] - 7:15, 22:19
**Eagles** [1] - 60:11
**early** [1] - 25:23
**East** [1] - 1:10
**easy** [1] - 4:17
**edition** [1] - 29:24
**effect** [2] - 39:19, 53:13
**effective** [2] - 46:14, 52:13
**effectiveness** [10] - 36:21, 38:9, 38:11, 39:4, 40:9, 43:18, 44:11, 44:15, 44:22, 47:11
**efficacy** [10] - 36:10, 38:11, 38:13, 40:9, 40:11, 44:4, 44:10, 44:24, 46:6

**eighth** [1] - 23:9
**either** [3] - 7:2, 11:3, 31:11
**element** [2] - 14:20, 31:21
**elements** [6] - 8:25, 42:3, 42:5, 42:11, 42:12, 42:14
**elsewhere** [1] - 38:20
**embodiment** [18] - 9:22, 9:23, 10:3, 10:24, 11:3, 11:6, 11:9, 11:10, 11:11, 11:21, 12:5, 14:19, 14:23, 15:25, 16:16, 25:15, 25:21
**Embodiments** [1] - 38:5
**embodiments** [15] - 9:21, 10:13, 10:15, 10:16, 10:25, 12:2, 12:6, 12:10, 14:16, 25:16, 28:21, 28:23, 28:25
**emergent** [1] - 5:10
**employ** [1] - 40:19
**encompassed** [2] - 25:23, 27:15
**end** [3] - 17:14, 19:3, 29:2
**ENDO** [1] - 1:4
**entire** [2] - 41:24, 59:13
**entirely** [1] - 34:19
**equally** [1] - 12:9
**Eric** [1] - 3:13
**ERIC** [1] - 2:2
**ESQUIRE** [8] - 1:16, 1:19, 1:19, 1:20, 2:2, 2:3, 2:6, 2:6
**essentially** [10] - 30:4, 37:4, 41:19, 42:5, 42:13, 42:17, 42:24, 43:3, 43:7, 48:9
**establish** [2] - 35:4, 59:6
**evaluation** [1] - 48:9
**evidence** [33] - 5:23, 6:25, 17:7, 17:8, 17:16, 17:18, 26:16, 27:10, 33:6, 33:18, 34:4, 34:15, 34:18, 34:24, 35:4, 35:5, 37:5, 38:19, 39:10, 39:12, 39:20, 40:22, 45:8, 52:3, 52:4, 52:5, 53:9, 53:11, 53:17, 53:22, 55:20, 55:22
**ex** [1] - 52:19

**exact** [2] - 11:2, 11:7
**exactly** [6] - 6:19, 12:17, 14:4, 17:4, 19:6, 58:6
**example** [11] - 6:24, 8:6, 8:18, 10:14, 11:1, 11:10, 11:19, 15:2, 15:13, 20:9, 46:15
**examples** [4] - 25:16, 58:16, 58:17, 58:18
**exceed** [1] - 51:3
**exceeded** [1] - 51:1
**except** [1] - 7:17
**excerpt** [2] - 26:17, 50:20
**excerpts** [1] - 52:15
**exclude** [4] - 7:21, 8:21, 9:2, 22:24
**exclusively** [2] - 12:12, 26:13
**exemplary** [1] - 9:21, 24:5
**existed** [1] - 35:18
**existence** [1] - 20:7
**existing** [1] - 35:18
**exists** [1] - 40:22
**experiments** [1] - 35:25
**expert** [36] - 13:15, 13:16, 14:1, 14:2, 14:6, 14:8, 32:10, 33:9, 34:15, 34:18, 34:21, 34:24, 35:2, 37:11, 39:13, 39:19, 40:24, 41:8, 41:11, 45:8, 45:23, 51:13, 51:14, 52:1, 52:12, 52:13, 52:16, 52:20, 53:1, 53:4, 53:15, 53:16, 53:22, 54:2
**experts** [3] - 34:24, 40:7, 40:10
**explain** [1] - 7:21
**explained** [2] - 10:14, 52:23
**explaining** [1] - 21:9
**explicitly** [3] - 6:21, 22:20, 34:23
**expressed** [1] - 21:23
**expressly** [8] - 7:18, 8:15, 9:24, 27:12, 35:14, 36:7, 38:18, 53:22
**extensive** [2] - 38:24, 39:6
**extent** [2] - 45:8
**extrapolate** [1] - 47:20
**extrinsic** [2] - 26:16, 27:10

**exact** (see above)

---

### F

**face** [5] - 5:4, 12:20, 13:10, 13:12, 14:10
**fact** [12] - 16:9, 28:14, 29:7, 31:19, 34:6, 34:7, 45:9, 47:2, 47:5, 47:22, 54:1, 54:21
**fact-finder** [1] - 31:19
**failed** [3] - 33:22, 34:10, 35:3
**fails** [1] - 40:25
**fall** [1] - 42:22
**families** [1] - 10:13
**fan** [1] - 60:8
**far** [2] - 18:14, 25:13
**favor** [1] - 4:15
**FDA** [1] - 40:1
**featured** [1] - 43:22
**features** [1] - 25:19
**federal** [15] - 10:14, 12:15, 13:8, 25:6, 31:6, 32:14, 34:23, 35:7, 42:22, 45:20, 45:21, 48:18, 51:16, 54:2
**field** [2] - 26:19, 27:2
**fighting** [1] - 22:14
**figure** [1] - 40:10
**file** [1] - 15:5
**filed** [1] - 15:4
**final** [1] - 39:16
**finally** [3] - 27:18, 29:5, 47:15
**finder** [1] - 31:19
**fine** [4] - 8:21, 59:15, 60:3, 60:16
**firm** [1] - 3:18
**first** [27] - 4:9, 5:25, 6:1, 6:7, 17:2, 18:14, 19:7, 23:19, 24:21, 28:7, 31:8, 31:10, 31:14, 32:4, 32:18, 33:3, 33:20, 35:6, 35:16, 37:20, 39:9, 43:25, 49:12, 49:17, 50:1, 56:12
**Fisher** [1] - 1:10
**fit** [1] - 4:4
**fits** [1] - 6:18
**five** [6] - 43:15, 45:25, 49:11, 49:15, 50:1, 51:2
**flag** [1] - 46:23
**focus** [1] - 48:23
**focused** [1] - 9:2
**folks** [2] - 16:19, 26:19
**follow** [4] - 4:12, 7:10, 7:11

**following** [1] - 25:15
**follows** [1] - 48:10
**FOR** [1] - 1:1
**forget** [1] - 60:22
**forgot** [1] - 59:8
**form** [19] - 5:24, 10:4, 10:5, 10:7, 10:11, 10:18, 10:19, 11:5, 14:20, 14:24, 19:21, 29:9, 30:22, 34:21, 38:16, 39:7, 42:4, 42:14
**formally** [1] - 47:9
**forms** [1] - 23:7
**formula** [1] - 19:17
**formulas** [1] - 21:25
**formulate** [1] - 21:18
**formulated** [5] - 26:10, 26:12, 26:13, 27:8
**formulating** [1] - 35:22
**formulation** [17] - 8:4, 8:9, 8:13, 9:4, 10:1, 11:9, 12:23, 12:25, 22:16, 31:12, 36:10, 44:7, 49:15, 50:1, 50:22, 56:5, 58:5
**formulations** [5] - 35:19, 35:24, 38:5, 47:6, 53:14
**forth** [4] - 4:11, 36:3, 36:11, 36:15
**forward** [2] - 55:21, 59:18
**four** [17] - 4:7, 5:8, 6:12, 15:16, 19:3, 36:15, 37:3, 37:23, 38:18, 38:20, 39:22, 41:21, 43:24, 47:4, 47:20, 48:18, 61:2
**fourth** [2] - 6:15, 44:6
**framing** [1] - 7:22
**Francisco** [1] - 60:5
**frequently** [2] - 8:10, 24:8
**Friday** [2] - 60:1, 60:14
**full** [2] - 16:1, 32:10

**G**

**Gagliardi** [3] - 3:11, 54:8, 57:25
**GAGLIARDI** [6] - 1:20, 54:7, 55:9, 57:7, 57:14, 59:2
**game** [2] - 60:10, 60:19
**gearing** [1] - 60:9

**gel** [1] - 40:13
**general** [3] - 11:10, 23:2, 33:24
**generally** [2] - 5:6, 43:4
**generic** [1] - 23:5
**generically** [1] - 24:7
**GILSON** [1] - 2:5
**given** [2] - 6:24, 41:19
**GOLDBERG** [1] - 1:19
**govern** [2] - 13:9, 24:12
**governs** [1] - 18:9
**graphic** [1] - 9:7
**great** [2] - 12:12, 61:3
**green** [8] - 8:7, 9:25, 10:4, 10:6, 11:17, 58:4
**guess** [3] - 5:1, 60:5, 60:12
**guidance** [1] - 43:2
**Guy** [1] - 3:20

**H**

**Haemonetics** [1] - 10:14
**half** [4] - 49:6, 49:10, 49:14, 49:16
**happy** [1] - 32:17
**head** [1] - 51:24
**heading** [2] - 27:14, 46:2
**headings** [1] - 45:25
**heard** [1] - 11:1
**hearing** [2] - 4:3, 32:21
**HEARING** [1] - 1:5
**heavily** [2] - 12:3, 43:23
**heavy** [1] - 34:4
**held** [1] - 3:1
**help** [1] - 49:8
**helpful** [2] - 16:24, 43:2
**helps** [2] - 7:25, 46:23
**high** [1] - 56:3
**high-performance** [1] - 56:3
**higher** [2] - 17:2, 45:3
**highlight** [1] - 58:16
**highlighted** [8] - 8:7, 9:25, 11:2, 11:16, 11:17, 26:23, 58:3, 58:8
**highlighting** [2] - 10:6, 11:16
**highlights** [1] - 52:19
**Hill** [2] - 3:13, 3:18
**HILL** [1] - 2:2

**hinged** [1] - 51:13
**history** [7] - 17:18, 33:5, 36:3, 38:25, 48:12, 52:21, 53:2
**hit** [1] - 51:24
**hold** [3] - 4:19, 7:18, 32:21
**holds** [1] - 10:3
**home** [1] - 57:25
**honest** [1] - 16:19
**Honor** [41] - 3:6, 3:8, 3:12, 3:20, 4:5, 4:14, 5:15, 7:15, 12:2, 12:14, 12:21, 13:14, 14:17, 15:6, 17:6, 17:7, 17:17, 17:24, 22:9, 28:5, 30:3, 32:17, 42:22, 45:1, 45:7, 51:23, 51:24, 52:17, 52:20, 53:17, 53:24, 54:3, 54:7, 58:23, 59:7, 59:21, 59:22, 59:25, 60:8, 61:5
**Honor's** [4] - 32:23, 42:9, 43:14, 59:8
**HONORABLE** [1] - 1:13
**Honorable** [1] - 3:1
**hormone** [1] - 26:8
**hospital** [2] - 36:23, 56:22
**hour** [2] - 49:16, 49:17
**hours** [1] - 3:25
**HPLC** [8] - 54:10, 56:1, 56:3, 56:24, 58:2, 58:9, 58:20, 58:25
**huge** [1] - 60:8
**human** [7] - 5:22, 11:4, 11:5, 16:12, 21:8, 40:1, 57:12
**humans** [1] - 18:16
**humidity** [1] - 50:25
**hundreds** [1] - 12:8
**hypotension** [19] - 35:12, 36:21, 36:22, 38:10, 38:12, 38:14, 39:4, 40:9, 43:19, 44:11, 44:15, 44:23, 45:10, 46:8, 47:12, 47:13, 52:7, 52:13, 56:20
**hypotensive** [1] - 52:11
**hypothalamus** [1] - 26:1
**HZNP** [11] - 42:21, 45:17, 45:19, 48:8, 48:17, 48:18, 51:7,

51:13, 53:21, 53:22, 53:25

**I**

**ID** [33] - 18:6, 18:23, 19:7, 19:9, 19:11, 19:15, 19:18, 19:21, 20:11, 20:20, 20:25, 22:7, 23:23, 24:6, 24:9, 24:10, 24:14, 24:16, 24:19, 24:25, 25:2, 25:10, 25:20, 28:10, 28:12, 28:15, 28:17, 28:18, 28:24, 29:1, 29:22, 50:9
**idea** [1] - 32:2
**identical** [2] - 7:16, 10:24
**identification** [2] - 28:9, 41:13, 45:16
**identified** [11] - 30:4, 36:18, 37:2, 37:23, 39:11, 43:8, 43:24, 45:21, 48:25, 51:8
**identifier** [1] - 28:12
**identifies** [1] - 47:4
**identify** [10] - 20:3, 37:5, 38:9, 41:1, 43:5, 45:19, 47:1, 48:1, 56:5, 56:18
**identifying** [1] - 28:18
**ignore** [3] - 44:6, 47:22, 52:21
**ignoring** [2] - 9:14, 9:17
**IL** [1] - 2:8
**illustrated** [2] - 19:11, 20:11
**illustrative** [1] - 25:16
**images** [1] - 7:25
**impact** [2] - 30:19, 36:1
**implicated** [1] - 54:16
**importance** [1] - 52:19
**important** [8] - 7:3, 7:17, 7:22, 16:14, 17:10, 23:17, 33:14, 58:1
**importantly** [2] - 7:21, 22:6
**imprecision** [2] - 34:6, 34:8
**improper** [4] - 23:25, 24:2, 24:20, 53:8
**impurities** [19] - 19:18, 50:24, 51:2, 54:9, 54:15, 54:22, 54:24, 55:1, 55:5, 56:7, 56:8, 56:10,

56:25, 57:1, 57:4, 57:11, 57:19, 58:6, 58:10
**INC** [2] - 1:3, 1:8
**include** [7] - 9:3, 18:16, 21:1, 24:15, 31:2, 42:14, 49:25
**included** [2] - 29:2, 29:15
**includes** [3] - 26:22, 38:24, 40:1
**including** [4] - 14:23, 27:3, 28:17
**inclusion** [1] - 42:24
**increasing** [1] - 6:6
**increment** [1] - 50:8
**increments** [10] - 49:11, 49:12, 49:16, 49:17, 49:18, 50:1, 50:3, 50:4, 50:11, 50:14
**indefinite** [17] - 31:25, 32:1, 32:3, 32:6, 34:7, 34:9, 39:17, 39:22, 40:17, 41:22, 41:23, 48:21, 48:22, 51:12, 51:18, 53:18
**indefiniteness** [6] - 32:5, 33:21, 33:25, 34:3, 34:5, 34:21
**independent** [3] - 12:17, 13:10, 54:18
**indicates** [1] - 49:1
**indicating** [4] - 6:25, 20:6, 20:13, 20:21
**indication** [1] - 51:5
**inform** [4] - 33:22, 34:12, 43:11, 48:14
**information** [2] - 4:9, 21:2
**informed** [1] - 33:11
**infringe** [5] - 11:23, 11:25, 58:2, 58:24
**infringed** [1] - 59:12
**infringement** [7] - 31:7, 31:19, 37:17, 54:15, 55:2, 59:5, 59:6
**infringes** [1] - 55:14
**infringing** [2] - 11:23, 55:17
**ingredient** [2] - 23:4, 31:11
**ingredients** [4] - 30:11, 30:12, 31:2, 40:2
**inject** [2] - 6:22, 40:1
**injected** [2] - 5:11, 40:14
**injection** [11] - 26:21,

26:22, 27:12, 27:14, 37:1, 38:15, 39:6, 39:7, 40:12, 43:20, 44:12

**injections** [1] - 38:18

**INNOVATION** [1] - 1:4

**inquiry** [2] - 29:17, 43:5

**instance** [2] - 12:18, 35:14

**instead** [6] - 10:23, 20:9, 20:20, 23:10, 24:11, 49:18

**intended** [2] - 15:25, 24:9

**intention** [1] - 56:8

**intermuscular** [1] - 46:16

**interpret** [2] - 41:10, 53:5

**intravenous** [11] - 6:8, 37:1, 38:15, 38:17, 39:6, 39:7, 40:12, 43:19, 44:12, 46:15, 47:16

**intravenously** [2] - 6:15, 35:11

**intrinsic** [8] - 33:6, 33:18, 37:5, 38:19, 39:10, 52:2, 52:4, 52:5

**introduce** [2] - 3:14, 3:17

**invalid** [2] - 37:9, 51:18

**invalidate** [3] - 32:1, 32:5, 51:7

**invalidated** [1] - 34:20

**invalidity** [7] - 34:1, 35:2, 35:5, 37:8, 37:17, 51:20

**invent** [1] - 35:17

**invention** [19] - 17:6, 20:1, 21:12, 25:17, 29:16, 29:17, 31:4, 31:23, 33:23, 35:8, 35:10, 36:13, 42:20, 43:1, 43:13, 48:16, 49:10, 49:21

**inventions** [4] - 31:9, 36:25, 49:25, 50:7

**inventors** [2] - 52:22, 58:20

**involve** [1] - 16:15

**involved** [3] - 34:6, 34:8, 48:8

**issue** [8] - 9:3, 24:21, 31:12, 31:24, 32:4, 33:10, 39:20, 47:6

**itself** [5] - 24:4, 25:13,

40:23, 45:10, 48:5

**IV** [9] - 4:25, 5:11, 6:25, 10:21, 10:22, 15:23, 16:10, 46:11

---

**J**

**January** [2] - 1:11, 3:2

**JERSEY** [1] - 1:1

**Jersey** [2] - 1:11, 3:13

**judge** [2] - 52:4, 57:15

**Judge** [13] - 3:2, 3:15, 3:22, 4:12, 7:14, 7:18, 9:1, 13:7, 14:14, 17:1, 18:10, 60:24, 61:6

**JUDGE** [1] - 1:13

**judges** [1] - 45:23

**jump** [2] - 4:9, 4:18

**juncture** [1] - 40:19

**jury** [1] - 32:11

---

**K**

**Kansas** [3] - 60:4, 60:8, 60:9

**keep** [2] - 15:21, 17:11

**key** [1] - 26:11

**kilograms** [3] - 55:11, 55:12, 55:19

**kind** [5] - 16:22, 30:6, 30:16, 53:17, 55:20

**kinds** [1] - 35:23

**King** [1] - 60:22

**knock** [1] - 41:24

**knowing** [1] - 22:19

**knowledge** [1] - 27:2

**knows** [2] - 6:23, 19:11, 40:16

**knows** [2] - 14:2, 14:6

---

**L**

**lab** [3] - 56:4, 56:24, 57:11

**label** [1] - 29:10

**labeling** [2] - 29:6

**laid** [1] - 43:17

**Lamb** [1] - 13:19

**Lamb-Weston** [1] - 13:19

**language** [4] - 24:15, 25:14, 57:21, 58:23

**laser** [1] - 56:11

**last** [6] - 13:14, 16:25, 42:22, 52:10, 54:6, 54:9

**LAURA** [1] - 2:6

**Laura** [1] - 3:16

**law** [6] - 12:14, 25:6,

34:4, 35:3, 42:21

**lawyer** [2] - 34:19, 52:4

**lead** [1] - 15:23

**least** [6] - 16:18, 37:18, 54:6, 58:16, 60:24, 61:2

**left** [2] - 8:19, 9:9

**level** [11] - 11:2, 11:7, 41:16, 45:3, 49:8, 49:20, 49:21, 49:23, 50:6, 50:9, 50:17

**lexicography** [2] - 25:5, 28:1

**life** [1] - 49:7

**light** [6] - 10:4, 10:6, 11:17, 22:15, 48:11, 52:17

**likely** [1] - 55:22

**limit** [6] - 22:21, 24:9, 25:17, 25:18, 28:1, 58:10

**limitation** [6] - 23:19, 27:5, 54:13, 54:24, 58:14, 59:4

**limitations** [2] - 23:16, 25:12

**limited** [9] - 5:15, 5:16, 13:11, 23:23, 24:22, 26:17, 27:7, 30:18, 58:12

**limiting** [2] - 25:14, 56:8

**limits** [1] - 42:18

**line** [4] - 43:22, 46:9, 46:13, 52:10

**lined** [1] - 18:1

**lines** [1] - 43:15

**LIONE** [1] - 2:5

**liquid** [1] - 56:3

**list** [4] - 24:6, 36:13, 40:1, 46:9

**listed** [6] - 19:14, 20:1, 42:7, 42:25, 44:6, 47:20

**listing** [11] - 19:23, 20:5, 20:6, 20:24, 21:2, 21:14, 21:15, 22:7, 25:3, 28:17, 47:18

**listings** [5] - 19:4, 28:24, 29:1, 29:3, 29:4

**lists** [4] - 27:12, 42:2, 43:22, 44:5

**literally** [1] - 12:7

**literature** [1] - 23:6

**Lithuanian** [2] - 22:16

**lives** [3] - 49:11, 49:14, 49:16

**LLC** [2] - 1:4, 1:5

**LLP** [4] - 1:15, 1:18, 2:2, 3:9

**long-term** [1] - 35:24

**look** [15] - 4:18, 5:6, 10:5, 10:13, 11:13, 12:15, 14:18, 15:5, 18:4, 24:4, 27:10, 35:6, 51:15, 57:24, 58:2

**looked** [5] - 20:16, 42:12, 45:22, 45:23, 54:1

**looking** [1] - 43:14

**loss** [1] - 38:2

**low** [1] - 36:22

**lump** [1] - 13:25

**Luther** [1] - 60:22

**Lydigsen** [2] - 3:16, 60:8

**LYDIGSEN** [13] - 2:6, 22:9, 22:12, 24:3, 29:20, 40:21, 41:4, 41:6, 41:13, 44:20, 45:1, 45:14, 53:25

**Lys** [3] - 20:9, 20:15, 20:20

**lysine** [10] - 18:16, 18:17, 20:8, 20:14, 23:14, 25:9, 27:13, 27:15, 29:15, 29:18

---

**M**

**magic** [1] - 24:15

**majority** [1] - 16:5

**manage** [1] - 32:20

**Mark** [1] - 3:14

**MARK** [1] - 2:6

**MARKMAN** [1] - 1:5

**Markman** [2] - 32:21, 51:15

**MARTIN** [1] - 1:19

**Martin** [3] - 3:10, 4:6, 60:22

**MARTINOTTI** [2] - 1:13, 3:2

**mass** [8] - 55:11, 55:12, 55:13, 55:14, 55:16, 55:19, 55:22

**material** [2] - 23:24, 39:19

**materially** [11] - 7:13, 30:13, 31:3, 31:13, 31:21, 37:16, 40:5, 40:10, 40:14, 42:19, 42:25

**materials** [1] - 42:18

**matter** [3] - 8:8, 18:22, 35:3

**McKay** [1] - 1:23

**McKay-Soule** [1] - 1:23

**mean** [6] - 21:24, 34:6, 34:8, 44:16, 44:24, 57:17

**meaning** [18] - 9:17, 12:21, 13:3, 13:16, 14:5, 14:9, 17:9, 17:17, 23:3, 25:7, 28:2, 30:7, 30:15, 30:22, 31:24, 41:20, 54:12, 58:14

**means** [6] - 10:18, 25:3, 38:3, 39:25, 46:24, 58:9

**meant** [1] - 52:18

**measure** [1] - 15:22

**measured** [1] - 49:15

**measurements** [1] - 50:13

**measures** [1] - 49:5

**mechanical** [1] - 1:25

**medical** [1] - 26:19

**medicine** [1] - 7:3

**meet** [4] - 8:25, 22:22, 34:10, 55:21

**meeting** [1] - 53:10

**Megan** [1] - 1:23

**megansoule430@ gmail.com** [1] - 1:23

**mention** [3] - 4:24, 9:23, 59:8

**mentioned** [4] - 5:14, 9:18, 38:12, 42:6

**mentions** [3] - 9:24, 38:3, 54:1

**merits** [1] - 35:23

**met** [3] - 15:21, 53:19, 59:4

**method** [18] - 6:6, 6:20, 13:22, 42:3, 54:10, 55:3, 55:6, 55:24, 56:19, 56:23, 58:2, 58:9, 58:12, 58:20, 58:25

**microgram** [2] - 15:1, 15:2

**micrograms** [6] - 10:9, 10:10, 14:21, 14:22, 15:12

**Microsoft** [1] - 34:2

**might** [2] - 28:1, 33:10

**milligrams** [4] - 8:11, 9:11, 10:9, 14:25

**milliliter** [6] - 8:11, 9:11, 10:8, 14:22, 14:25

**mine** [1] - 3:10

**minute** [5] - 5:21,

16:8, 30:25, 37:7, 45:18

**minutes** [1] - 56:25

**missing** [1] - 25:2

**mix** [1] - 50:12

**mixing** [1] - 56:14

**mobile** [2] - 56:13, 56:14

**modulation** [1] - 44:7

**molecules** [1] - 23:10

**moment** [1] - 33:7

**momentarily** [1] - 60:25

**months** [2] - 51:1, 51:3

**morning** [11] - 3:4, 3:6, 3:8, 3:10, 3:12, 3:15, 3:21, 17:24, 22:9, 22:10, 54:7

**most** [4] - 16:14, 17:9, 22:6, 23:17

**mouthpiece** [1] - 41:8

**moving** [1] - 59:18

**MPEP** [2] - 42:8, 42:21

**MR** [45] - 3:6, 3:8, 3:12, 3:15, 3:16, 3:20, 3:24, 4:5, 4:14, 4:17, 5:15, 7:9, 7:11, 12:20, 14:14, 14:17, 17:1, 17:24, 18:4, 18:24, 19:2, 28:5, 30:3, 32:9, 32:15, 33:2, 33:14, 33:20, 45:7, 51:23, 53:21, 57:15, 59:7, 59:21, 59:22, 59:25, 60:1, 60:3, 60:7, 60:11, 60:13, 60:16, 60:19, 61:5, 61:6

**MS** [17] - 22:9, 22:12, 24:3, 29:20, 40:21, 41:4, 41:6, 41:13, 44:20, 45:1, 45:14, 53:25, 54:7, 55:9, 57:7, 57:14, 59:2

**multiple** [1] - 51:19

**muscles** [1] - 26:9

**must** [5] - 13:13, 28:11, 43:11, 48:12, 48:14

**N**

**nail** [1] - 51:24

**Nakul** [1] - 3:18

**NAKUL** [1] - 2:3

**name** [2] - 3:12, 27:12

**narrow** [2] - 11:22, 49:18

**narrower** [2] - 11:19,

25:7

**natural** [3] - 21:6, 25:8, 29:6

**naturally** [7] - 18:20, 21:7, 22:17, 23:15, 26:3, 26:15, 26:25

**nature** [2] - 56:1, 57:4

**Nautilus** [1] - 33:24

**necessarily** [3] - 26:5, 27:3, 27:9

**need** [17] - 8:22, 24:15, 24:18, 33:1, 33:7, 40:24, 41:8, 41:11, 44:17, 46:11, 46:17, 50:14, 53:1, 55:20, 59:3, 59:23, 60:14

**needed** [3] - 5:9, 25:5, 33:4

**needing** [1] - 56:22

**needs** [7] - 5:10, 17:6, 26:4, 36:24, 40:19, 45:9, 53:17

**neurosecretory** [1] - 25:25

**never** [2] - 9:1, 60:22

**new** [1] - 47:24

**NEW'** [1] - 1:1

**New** [2] - 1:11, 3:13

**next** [8] - 9:19, 17:23, 18:1, 30:3, 38:9, 60:1, 60:13, 60:14

**NJ** [2] - 1:17, 2:4

**nobody** [1] - 60:4

**nobody's** [1] - 29:11

**non** [1] - 25:16

**non-embodiments** [1] - 25:16

**none** [1] - 47:23

**nonlimiting** [2] - 25:21, 28:22

**nonsensical** [3] - 57:6, 57:7, 59:16

**nonsensicality** [1] - 59:9

**normal** [2] - 32:6, 33:16

**North** [1] - 2:7

**note** [1] - 14:24

**noted** [1] - 38:22

**notes** [1] - 21:10

**nothing** [8] - 4:24, 6:21, 12:5, 27:25, 29:4, 29:24, 54:3, 58:12

**notion** [2] - 12:4, 53:12

**notwithstanding** [1] - 14:5

**novel** [42] - 30:13,

31:3, 31:8, 31:14, 31:17, 31:22, 32:18, 33:3, 35:8, 36:6, 36:12, 36:16, 37:8, 37:10, 37:11, 37:12, 39:13, 39:14, 39:15, 40:25, 41:14, 42:20, 43:1, 43:6, 43:11, 43:17, 45:5, 45:16, 45:20, 46:19, 47:2, 47:19, 47:24, 48:1, 48:11, 48:13, 49:9, 49:10, 49:20, 50:18, 51:9, 51:12

**novels** [1] - 40:5

**novelty** [1] - 39:12

**nowhere** [1] - 5:14

**NUMBER** [1] - 1:3

**number** [34] - 4:22, 6:3, 6:9, 14:21, 18:7, 19:7, 19:9, 19:10, 19:12, 19:15, 19:19, 19:22, 20:11, 20:20, 21:1, 23:24, 24:14, 24:19, 24:25, 25:3, 25:20, 28:10, 28:13, 28:15, 28:17, 28:18, 29:22, 30:2, 43:5, 47:12, 50:10, 54:25, 56:8, 56:13

**numbers** [2] - 24:9, 28:24

**numerous** [1] - 49:5

**O**

**objective** [2] - 48:12, 49:7

**observed** [2] - 50:24, 51:2

**obvious** [1] - 39:23

**obviously** [1] - 33:8

**occur** [2] - 23:15, 28:10

**occurred** [1] - 55:2

**occurring** [3] - 22:17, 26:15, 26:25

**occurs** [2] - 21:7, 23:13

**OF** [1] - 1:1

**offered** [1] - 36:13

**office** [2] - 39:15, 52:23

**Official** [1] - 1:23

**oftentimes** [1] - 23:10

**once** [1] - 43:7

**one** [56] - 4:17, 6:24, 7:5, 7:17, 8:9, 9:18, 9:22, 9:23, 10:15, 11:25, 12:3, 12:13,

15:25, 16:17, 17:4, 17:8, 17:15, 17:19, 18:8, 18:9, 19:7, 19:12, 19:14, 19:19, 23:18, 26:7, 28:7, 30:5, 30:17, 30:19, 31:18, 37:16, 37:23, 38:1, 38:10, 43:5, 44:1, 45:25, 46:4, 47:3, 48:19, 48:21, 49:6, 49:11, 49:14, 49:16, 50:3, 51:19, 56:13, 58:1, 58:25, 59:8, 60:24

**ones** [2] - 30:12, 42:8

**open** [2] - 3:1, 42:9

**opening** [1] - 45:15

**opposed** [2] - 18:20, 21:5

**opposite** [2] - 25:21, 26:15

**orange** [1] - 11:2

**order** [2] - 25:6, 45:18

**ordinary** [36] - 12:21, 18:7, 23:3, 25:7, 27:1, 27:16, 27:22, 28:2, 30:7, 30:14, 31:24, 32:2, 34:12, 34:13, 39:24, 41:1, 41:20, 43:12, 44:3, 44:13, 44:23, 44:25, 45:3, 46:12, 47:1, 47:23, 48:15, 49:3, 49:8, 50:15, 52:3, 52:6, 53:7, 54:12, 56:21, 57:9

**Organism** [1] - 21:2

**orient** [1] - 30:16

**origin** [1] - 26:22

**original** [2] - 15:9, 15:21

**origins** [1] - 21:6

**otherwise** [1] - 44:13

**ourselves** [1] - 30:16

**own** [5] - 15:24, 22:2, 40:24, 44:9, 49:1

**P**

**PA** [1] - 1:21

**page** [3] - 28:8, 37:22, 45:15

**pages** [3] - 12:8, 19:3, 59:19

**Paki** [1] - 3:17

**Par** [18] - 9:9, 12:3, 12:12, 12:17, 17:11, 23:2, 24:1, 24:9, 37:23, 41:18, 42:16, 43:4, 43:21, 47:4,

47:19, 48:2, 48:18, 48:25

**PAR** [3] - 1:3, 1:4, 1:4

**Par's** [10] - 9:7, 14:4, 17:20, 18:5, 22:13, 23:4, 43:15, 47:10, 51:13, 54:11

**paragraph** [1] - 43:10

**parameters** [1] - 6:9

**parenteral** [1] - 46:16

**parenthetical** [4] - 7:18, 16:18, 26:24, 41:20

**part** [13] - 5:25, 6:1, 14:12, 18:19, 26:1, 28:24, 32:15, 36:25, 52:7, 54:15, 55:25, 56:23, 57:1

**particular** [19] - 5:12, 5:20, 5:23, 6:16, 15:15, 16:8, 18:6, 30:19, 31:11, 31:20, 35:13, 35:15, 36:4, 37:1, 47:1, 47:3, 48:9, 51:11

**particulars** [1] - 52:24

**parties** [1] - 18:8

**parties'** [4] - 18:4, 23:18, 23:24, 41:18

**parts** [1] - 47:21

**passage** [4] - 26:23, 43:20, 48:17, 49:10

**passages** [3] - 25:14, 26:6, 53:24

**patent** [59] - 6:18, 6:21, 9:22, 10:17, 11:15, 11:20, 11:23, 13:1, 20:10, 22:16, 24:5, 24:13, 24:24, 25:6, 26:3, 26:14, 27:25, 29:2, 30:6, 30:17, 30:18, 30:19, 34:20, 35:15, 39:15, 40:24, 41:9, 41:22, 41:24, 43:20, 44:7, 44:9, 44:13, 44:20, 44:21, 45:2, 45:4, 45:16, 45:22, 45:23, 46:7, 46:12, 46:18, 46:22, 47:17, 47:22, 48:10, 49:1, 49:20, 49:22, 49:24, 50:7, 50:20, 51:5, 51:17, 52:23, 58:3, 58:17

**patentable** [3] - 36:6, 38:25, 52:25

**patented** [1] - 41:14

**patentee** [1] - 15:25

**patentees** [1] - 35:16

**patents** [6] - 4:25,

5:16, 12:8, 13:12, 19:3, 30:17
**patient** [16] - 5:12, 7:4, 8:14, 8:20, 9:13, 9:16, 12:23, 12:25, 13:13, 15:23, 16:4, 16:8, 56:20, 56:22, 56:24, 57:10
**patient's** [1] - 8:14
**patients** [3] - 35:11, 35:13, 36:22
**people** [5] - 7:1, 16:10, 32:1, 35:17, 36:23
**peptide** [2] - 19:11, 21:3
**peptides** [4] - 23:10, 24:13, 50:12, 54:25
**per** [8] - 5:21, 8:11, 9:11, 10:8, 14:21, 14:22, 14:25, 16:8
**percent** [18] - 49:11, 49:12, 49:14, 49:16, 49:25, 50:1, 50:2, 50:8, 50:14, 50:25, 51:1, 51:3, 51:4
**percentage** [1] - 50:13
**percentages** [1] - 50:11
**perfectly** [1] - 59:15
**perform** [2] - 6:20, 58:25
**performance** [1] - 56:3
**performed** [4] - 54:14, 55:25, 58:21, 58:22
**perhaps** [1] - 60:25
**permit** [1] - 59:18
**permits** [1] - 42:24
**person** [26] - 27:1, 27:16, 27:21, 34:11, 34:12, 39:23, 41:1, 43:12, 44:2, 44:12, 44:23, 44:25, 46:12, 46:17, 46:25, 47:23, 48:15, 49:2, 49:8, 50:15, 52:3, 52:6, 52:11, 53:7, 56:20, 57:8
**perspective** [2] - 16:15, 34:11
**persuasion** [1] - 34:4
**persuasive** [1] - 35:1
**pH** [2] - 6:10, 36:4
**Ph.D** [1] - 41:16
**pharmaceutical** [20] - 5:1, 6:7, 11:4, 23:3, 35:12, 36:19, 36:20, 38:5, 38:6, 38:8, 39:1, 39:2, 39:3,

39:25, 40:2, 43:18, 44:10, 46:13, 47:11, 54:19
**PHARMACEUTICAL** [1] - 1:3
**pharmaceutically** [5] - 30:24, 38:4, 40:4, 40:6, 47:14
**Pharmacopeia** [1] - 26:18
**phase** [3] - 56:13, 56:14, 56:17
**Philadelphia** [1] - 1:21
**phrase** [9] - 30:17, 31:1, 31:5, 31:25, 42:1, 42:9, 42:17, 42:23, 46:21
**phrases** [2] - 30:5, 42:7
**pick** [3] - 41:15, 45:4, 53:5
**piece** [1] - 17:8
**pieces** [1] - 53:6
**pigs** [1] - 18:18
**ping** [1] - 4:10
**ping-pong** [1] - 4:10
**places** [1] - 26:14
**plain** [10] - 9:17, 12:21, 13:3, 13:16, 14:5, 14:9, 14:10, 17:9, 17:17, 54:12
**plaintiff** [1] - 46:1
**Plaintiff** [2] - 1:17, 1:21
**plaintiffs** [4] - 3:9, 17:25, 22:18, 54:8
**Plaintiffs** [1] - 1:6
**plate** [1] - 60:17
**play** [1] - 11:13
**plays** [1] - 30:24
**Plaza** [1] - 2:7
**plurality** [1] - 54:25
**plus** [1] - 30:9
**point** [13] - 7:8, 7:22, 11:18, 16:3, 28:17, 33:8, 33:11, 34:15, 34:18, 53:21, 53:23, 58:19, 59:10
**pointed** [3] - 36:4, 43:21, 52:15
**pointer** [1] - 56:11
**points** [1] - 28:6
**polypeptide** [1] - 26:8
**pong** [1] - 4:10
**poor** [1] - 35:24
**portion** [4] - 21:8, 28:25, 29:3, 29:23
**portions** [1] - 46:6
**POSA** [5] - 41:10, 41:11, 44:17, 44:18

**position** [7] - 23:14, 36:11, 41:21, 44:8, 57:3, 57:15, 57:16
**possible** [4] - 17:3, 17:5, 50:17, 61:4
**possibly** [1] - 36:14
**post** [1] - 46:23
**powder** [1] - 19:21
**practical** [1] - 18:21
**practically** [1] - 39:23
**practice** [3] - 14:7, 17:5, 58:11
**practiced** [1] - 58:1
**preamble** [2] - 42:2, 42:3
**preceded** [1] - 28:12
**precedes** [1] - 28:23
**preferred** [3] - 12:5, 12:6, 12:7
**prepared** [2] - 18:20, 21:21
**preponderance** [1] - 55:21
**present** [8] - 10:11, 13:18, 53:23, 55:5, 56:7, 56:9, 57:1, 57:5
**presentation** [4] - 15:6, 15:13, 43:23, 52:19
**pressure** [5] - 5:11, 6:6, 16:12, 36:23, 36:24
**presumption** [1] - 58:13
**primary** [1] - 26:7
**Princeton** [3] - 1:17, 2:4, 3:13
**principal** [1] - 34:22
**problem** [8] - 13:23, 35:22, 36:17, 38:22, 40:11, 48:3, 49:1, 50:19
**problematic** [2] - 25:11, 44:8
**problems** [2] - 35:18, 51:19
**proceed** [1] - 4:3
**Proceedings** [1] - 1:25
**PROCEEDINGS** [1] - 3:1
**process** [1] - 22:22
**produced** [2] - 1:25, 51:11
**product** [14] - 5:7, 6:2, 13:2, 23:4, 23:5, 31:12, 35:12, 36:4, 36:20, 38:8, 40:6, 55:25, 56:1

**PRODUCTS** [1] - 1:4
**products** [6] - 26:22, 38:7, 39:2, 39:3, 40:2
**prohormone** [1] - 25:25
**proof** [7] - 33:15, 40:21, 53:10, 53:19, 55:21, 59:3, 59:5
**proper** [1] - 23:1
**properties** [5] - 8:4, 8:8, 8:9, 9:4, 10:1, 10:4, 10:5, 11:16, 11:17, 12:22, 12:24, 14:11, 31:4, 31:15, 31:22, 33:6, 35:8, 37:6, 37:8, 37:13, 37:16, 37:21, 37:23, 39:16, 39:19, 40:5, 40:25, 41:14, 41:15, 41:17, 41:21, 43:1, 43:6, 43:7, 43:11, 43:16, 43:17, 43:22, 43:24, 44:4, 45:5, 45:20, 46:1, 46:19, 46:24, 47:1, 47:4, 47:10, 47:18, 47:19, 47:21, 47:24, 48:2, 48:4, 48:11, 48:13, 48:18, 48:20, 49:10, 55:18, 57:5, 58:5
**property** [11] - 44:6, 45:16, 45:25, 46:3, 48:20, 48:21, 48:24, 49:2, 50:18, 51:9, 51:12
**proposal** [2] - 22:13, 36:11
**proposed** [4] - 7:16, 18:5, 18:8
**prosecution** [7] - 17:18, 33:5, 36:3, 38:24, 48:12, 52:21, 53:2
**protected** [2] - 12:10, 12:11
**prove** [4] - 15:19, 33:21, 40:17, 44:19
**provide** [8] - 10:7, 22:2, 25:16, 36:9, 38:5, 46:23, 48:12
**provided** [3] - 38:20, 42:25, 43:2
**providing** [3] - 6:7, 11:6, 35:3
**proving** [1] - 34:3
**pump** [2] - 10:23, 56:15
**purity** [2] - 50:6, 50:8
**purporting** [1] - 50:17

**purports** [2] - 49:21, 50:23
**purposes** [2] - 19:25, 21:21, 38:13
**push** [1] - 10:23
**put** [10] - 7:5, 8:14, 16:19, 19:24, 20:6, 20:12, 35:20, 51:15, 55:20, 56:15

### Q

**qualify** [2] - 25:4, 28:1
**quantify** [2] - 56:5, 56:7
**questions** [3] - 31:6, 51:24, 54:3
**quickly** [3] - 5:11, 28:5, 61:4
**quote** [1] - 37:22
**quotes** [1] - 42:23

### R

**raise** [2] - 5:3, 5:10
**raised** [2] - 28:6, 36:25
**raises** [1] - 31:6
**Randy** [1] - 60:12
**range** [1] - 11:25
**ranges** [1] - 11:12
**rare** [2] - 5:17, 16:6
**rate** [6] - 5:12, 5:20, 5:22, 6:16, 16:8, 16:12
**rather** [3] - 17:19, 25:18, 49:7
**ratios** [1] - 50:12
**reach** [1] - 53:6
**read** [15] - 4:2, 12:14, 13:1, 16:2, 23:19, 23:22, 24:20, 27:6, 41:8, 41:11, 41:14, 44:18, 44:23, 48:11, 50:15
**readily** [1] - 40:15
**reading** [8] - 7:1, 25:12, 29:21, 41:7, 44:13, 45:2, 46:23, 57:8
**reads** [2] - 52:4, 52:5
**real** [4] - 7:1, 8:1, 8:12, 9:8
**really** [11] - 4:20, 5:2, 12:3, 16:8, 18:13, 18:21, 31:6, 31:15, 36:24, 37:14, 39:17
**reason** [8] - 7:11, 11:11, 19:24, 22:14, 24:12, 41:8, 46:25

**reasonable** [6] - 33:23, 34:14, 34:17, 37:14, 43:12, 48:14
**reasoned** [1] - 4:13
**reasons** [3] - 24:3, 35:1, 44:5
**recent** [3] - 32:14, 34:23, 35:7
**recently** [1] - 22:15
**recite** [1] - 44:14
**recited** [6] - 30:10, 30:12, 30:22, 35:14, 42:11, 42:23
**recites** [2] - 42:3, 54:19
**recognize** [1] - 47:23
**recognized** [1] - 30:6
**record** [2] - 3:7, 39:21
**recorded** [1] - 1:25
**red** [1] - 7:17
**refer** [5] - 19:9, 23:6, 24:17, 27:22, 29:22
**reference** [10] - 4:23, 19:18, 20:17, 21:14, 21:16, 22:19, 22:25, 28:21, 28:22, 47:3
**Reference** [1] - 28:11
**referenced** [2] - 19:1, 38:18
**references** [3] - 19:10, 29:5, 38:16
**referencing** [1] - 29:25
**referred** [3] - 10:21, 38:11, 57:25
**referring** [9] - 19:5, 19:22, 21:17, 21:20, 22:2, 28:19, 37:24, 38:6
**refers** [4] - 24:7, 24:24, 29:7, 52:10
**reflect** [1] - 16:8
**reflects** [2] - 14:19, 15:24
**refrigerated** [1] - 5:9
**refrigerator** [2] - 6:12, 15:16
**regard** [2] - 9:5, 9:13
**regarding** [4] - 7:20, 31:16, 40:18, 52:16
**regulation** [4] - 28:7, 28:9, 28:16, 29:21
**regulations** [2] - 24:12, 24:16
**Reid** [1] - 60:12
**relate** [1] - 47:11
**related** [1] - 50:21
**relates** [2] - 28:7, 36:17
**relationship** [1] - 12:1
**relative** [2] - 34:7,

50:25
**relevant** [3] - 29:1, 29:17, 34:11
**reliance** [1] - 25:11
**relied** [6] - 34:22, 34:23, 45:19, 51:16, 53:22, 54:2
**relies** [3] - 12:3, 12:12, 17:20
**rely** [3] - 14:8, 26:6, 26:20
**relying** [1] - 34:19
**remarkable** [1] - 37:22
**reminded** [1] - 59:8
**remove** [1] - 16:18
**REMUS** [11] - 2:6, 3:15, 7:11, 14:17, 57:15, 59:7, 59:21, 60:1, 60:7, 60:19, 61:6
**Remus** [1] - 3:14
**render** [1] - 41:23
**reply** [2] - 15:5, 34:22
**Reporter** [1] - 1:23
**reports** [1] - 47:12
**representation** [1] - 9:8
**reproduced** [3] - 24:17, 25:1, 26:17
**require** [7] - 5:8, 5:20, 8:3, 24:8, 24:13, 45:3, 58:24
**required** [12] - 8:5, 8:8, 8:23, 9:4, 9:14, 13:4, 14:12, 18:19, 22:1, 54:12, 59:3, 59:6
**requires** [5] - 45:7, 45:8, 54:14, 54:18, 54:21
**requiring** [1] - 9:3
**requisite** [1] - 35:4
**resolving** [1] - 60:23
**respect** [8] - 23:19, 25:22, 29:22, 46:10, 47:5, 47:10, 47:15, 52:24
**respond** [2] - 4:10, 28:5
**rest** [3] - 35:25, 59:15, 60:19
**results** [1] - 51:11
**rewrite** [2] - 13:17, 14:9
**rewriting** [1] - 13:6
**RHOAD** [18] - 1:16, 3:8, 3:20, 17:1, 17:24, 18:4, 18:24, 19:2, 28:5, 30:3, 32:9, 32:15, 33:2,

33:14, 33:20, 45:7, 51:23, 53:21
**Rhoad** [6] - 3:8, 17:24, 23:16, 41:25, 42:6, 43:25
**Rhoad's** [1] - 43:23
**rigid** [1] - 21:25
**Road** [1] - 2:3
**Robert** [1] - 3:8
**ROBERT** [1] - 1:16
**role** [1] - 13:14
**rooting** [1] - 60:11
**Roszel** [1] - 2:3
**roughly** [1] - 19:3
**rule** [2] - 9:3, 13:9
**ruled** [3] - 4:14, 7:14, 9:1
**ruling** [1] - 18:11
**run** [1] - 57:11
**running** [2] - 56:24

## S

**saline** [1] - 8:19
**salt** [1] - 30:24
**sample** [4] - 50:24, 56:16, 59:14
**samples** [2] - 51:1, 51:2
**San** [1] - 60:4
**sandoz** [1] - 37:4
**SANDOZ** [1] - 1:8
**Sandoz** [11] - 3:17, 7:12, 9:16, 17:16, 31:25, 34:2, 34:10, 36:13, 40:21, 54:13, 57:22
**Sandoz's** [16] - 4:20, 7:16, 7:20, 8:2, 8:12, 8:17, 8:21, 9:6, 17:19, 18:7, 23:4, 41:21, 57:6, 57:15, 59:10, 59:16
**scale** [1] - 55:23
**scheme** [1] - 58:4
**scientific** [1] - 23:6
**scope** [13] - 13:11, 25:17, 25:18, 31:16, 32:3, 33:22, 34:13, 34:17, 34:25, 42:18, 43:12, 48:15, 49:3
**screen** [1] - 9:25
**seated** [1] - 3:5
**second** [13] - 4:19, 6:11, 18:19, 23:22, 26:23, 28:20, 31:10, 31:18, 37:14, 39:12, 39:17, 48:2, 50:19
**Section** [1] - 43:10
**section** [3] - 21:9,

24:17, 26:20
**see** [11] - 4:4, 7:25, 8:7, 8:9, 10:6, 15:6, 20:5, 20:10, 23:9, 23:12, 58:15
**seek** [1] - 22:23
**sell** [2] - 55:12
**selling** [2] - 55:18, 55:25
**Seltzer** [1] - 7:5
**semiclosed** [1] - 46:21
**sense** [3] - 4:18, 5:19, 32:9
**sentence** [7] - 37:24, 37:25, 38:4, 38:9, 38:16, 38:19, 46:5
**separate** [3] - 28:25, 56:4, 56:17
**septic** [1] - 36:24
**sequence** [49] - 18:6, 19:4, 19:7, 19:9, 19:11, 19:15, 19:18, 19:21, 19:23, 20:2, 20:4, 20:5, 20:11, 20:20, 20:24, 20:25, 21:1, 21:2, 21:3, 21:14, 22:7, 23:9, 23:23, 24:6, 24:10, 24:14, 24:15, 24:19, 24:25, 25:2, 25:10, 25:20, 27:12, 28:10, 28:11, 28:12, 28:15, 28:17, 28:18, 28:23, 28:24, 29:1, 29:2, 29:4, 29:22, 50:9
**sequences** [2] - 23:11
**set** [9] - 10:15, 10:16, 15:6, 15:20, 15:24, 36:11, 36:15
**several** [4] - 6:7, 26:6, 42:6, 54:20
**SHAH** [1] - 2:3
**Shah** [1] - 3:18
**SHARON** [1] - 1:20
**Sharon** [2] - 3:11, 54:7
**shock** [1] - 36:24
**short** [1] - 53:9
**show** [3] - 5:4, 45:19, 59:4
**showing** [1] - 8:18
**shown** [2] - 20:15, 23:7
**shows** [8] - 4:21, 9:21, 17:18, 19:15, 47:3, 49:6, 49:24, 56:2
**side** [8] - 41:18, 43:23, 47:4, 48:17
**silent** [2] - 4:25, 7:20
**similar** [2] - 13:18,

57:16
**similarity** [1] - 50:9
**simpler** [1] - 23:12
**simply** [8] - 11:3, 11:22, 17:20, 29:2, 29:11, 40:17, 58:9, 58:21
**simultaneous** [1] - 59:24
**sit** [2] - 5:21, 16:10
**sits** [1] - 15:16
**sitting** [1] - 56:22
**situation** [5] - 5:10, 5:17, 13:17, 13:18, 59:12
**six** [3] - 49:17, 58:16, 58:17
**ski** [1] - 60:9
**skill** [30] - 16:13, 27:1, 27:22, 32:2, 33:22, 34:12, 34:13, 39:24, 41:1, 43:12, 44:3, 44:13, 44:23, 44:25, 45:3, 46:12, 46:17, 47:1, 47:23, 48:13, 48:15, 49:3, 49:8, 50:15, 52:3, 52:6, 53:7, 55:17, 56:21, 57:9
**skill's** [1] - 27:16
**skip** [1] - 45:18
**slate** [1] - 9:5
**slide** [39] - 4:21, 6:3, 7:14, 7:15, 7:24, 8:7, 8:16, 9:7, 9:19, 9:20, 9:21, 11:1, 11:14, 12:22, 13:20, 14:18, 15:5, 20:5, 20:13, 21:1, 21:16, 23:7, 25:1, 28:8, 28:21, 36:7, 36:15, 37:25, 38:4, 47:2, 49:6, 49:24, 50:20, 56:2, 58:3, 58:16, 58:18
**slides** [2] - 19:10, 29:23
**smooth** [1] - 26:9
**sold** [1] - 57:2
**solely** [1] - 57:22
**solid** [1] - 40:13
**solution** [2] - 7:6, 26:10
**solutions** [1] - 35:20
**solvents** [1] - 56:13
**sometimes** [2] - 7:25, 16:5
**somewhat** [1] - 37:22
**sorry** [2] - 45:13, 53:21
**sort** [2] - 30:11, 31:9

**sought** [1] - 22:18
**Soule** [1] - 1:23
**speaking** [1] - 60:25
**spec** [1] - 35:25
**specific** [12] - 8:8, 8:10, 11:10, 11:19, 15:18, 24:8, 24:10, 24:14, 25:19, 29:22, 42:18, 53:24
**specifically** [23] - 10:9, 12:22, 12:24, 13:7, 19:5, 19:8, 20:4, 20:17, 21:17, 22:6, 26:21, 27:20, 27:22, 27:25, 28:9, 36:8, 38:10, 38:12, 38:15, 44:14, 50:5, 52:10, 57:18
**specification** [73] - 6:19, 6:23, 7:2, 7:7, 9:20, 10:20, 10:23, 12:5, 12:9, 15:24, 17:18, 19:8, 19:13, 19:22, 20:22, 21:8, 22:1, 22:5, 24:18, 24:24, 25:13, 25:20, 25:22, 25:24, 26:2, 26:4, 26:14, 27:2, 27:8, 27:25, 28:10, 29:3, 33:5, 38:21, 38:23, 40:23, 40:24, 41:7, 41:9, 41:15, 43:21, 44:7, 44:13, 44:20, 45:2, 45:5, 45:9, 45:17, 45:22, 45:24, 46:7, 46:13, 46:18, 46:22, 47:17, 47:22, 47:25, 48:5, 48:11, 49:1, 49:5, 49:21, 49:22, 50:7, 50:15, 51:5, 51:9, 51:17, 52:16, 53:6, 58:15, 58:19
**specificity** [2] - 12:2, 48:2
**specifics** [1] - 46:3
**specified** [3] - 54:10, 55:5, 55:17
**specifies** [1] - 55:1
**specify** [1] - 55:15
**specifying** [2] - 10:12, 55:20
**spell** [2] - 22:20, 47:25
**spelled** [4] - 23:17, 45:24, 47:18, 48:8
**spells** [2] - 48:18, 58:6
**spent** [1] - 60:22
**stability** [28] - 35:24, 36:2, 36:4, 36:9, 36:17, 36:18, 37:24,

38:3, 38:22, 40:15, 40:16, 43:18, 44:1, 47:5, 47:7, 48:23, 49:6, 49:9, 49:20, 49:22, 50:18, 50:21, 52:16, 52:18, 52:22, 52:25, 53:4, 53:14
**stable** [1] - 47:8
**stage** [3] - 43:4, 51:15, 51:21
**stand** [1] - 29:21
**standard** [7] - 32:4, 33:19, 33:20, 33:25, 40:19, 48:7, 53:10
**standards** [3] - 33:15, 33:21, 34:5
**start** [5] - 4:8, 9:9, 15:15, 54:17, 56:12
**starting** [2] - 9:9, 43:21
**starts** [1] - 35:21
**state** [4] - 24:18, 25:15, 26:4, 26:14
**State** [1] - 1:10
**statement** [2] - 36:7, 37:22
**statements** [1] - 4:22
**States** [1] - 3:2
**states** [4] - 25:24, 26:2, 26:21, 29:21
**STATES** [2] - 1:1, 1:13
**stationary** [1] - 56:17
**stenography** [1] - 1:25
**step** [12] - 6:7, 6:11, 6:13, 6:15, 10:2, 10:6, 43:5, 48:3, 51:19, 54:14, 55:24
**steps** [2] - 6:7, 42:19
**sterile** [1] - 26:10
**STERILE** [1] - 1:4
**still** [4] - 8:22, 8:24, 44:5, 60:11
**stipulated** [1] - 18:9
**storage** [1] - 5:8
**stored** [4] - 5:8, 50:23, 50:24, 51:2
**storing** [1] - 6:11
**story** [1] - 50:10
**straightforward** [1] - 8:2
**Street** [2] - 1:10, 1:20
**stronger** [1] - 51:20
**strongest** [1] - 12:13
**strongly** [1] - 12:4
**structural** [1] - 19:21
**structure** [5] - 6:4, 11:16, 19:17, 20:12, 20:19
**studied** [1] - 47:9
**studies** [1] - 47:13

**stuff** [1] - 37:11
**subcutaneous** [1] - 46:15
**subject** [2] - 8:7, 23:5
**submissions** [1] - 59:24
**submit** [2] - 59:2, 59:19
**submits** [2] - 9:16, 17:16
**submitted** [5] - 6:25, 17:3, 39:19, 52:22
**subsequent** [1] - 25:2
**substances** [1] - 19:6
**success** [1] - 47:9
**sufficient** [2] - 41:1, 48:2
**sufficiently** [6] - 43:11, 45:21, 48:4, 48:14, 48:25, 49:2
**suitability** [7] - 37:1, 38:15, 40:8, 40:12, 43:19, 44:12, 47:15
**suitable** [1] - 36:20
**Suite** [2] - 1:16, 2:7
**summarized** [1] - 13:19
**Sunday** [1] - 60:20
**Super** [1] - 60:5
**superfluous** [1] - 58:11
**supported** [1] - 54:11
**Supreme** [2] - 33:24, 34:2
**swallow** [1] - 7:5
**synthesis** [1] - 26:6
**synthesized** [2] - 23:15, 25:25
**synthetic** [26] - 18:24, 21:3, 21:15, 21:17, 22:5, 22:8, 22:21, 22:24, 23:21, 24:22, 24:25, 25:8, 25:19, 25:23, 26:4, 26:5, 26:11, 26:17, 26:24, 26:25, 27:4, 29:6, 29:8, 29:13, 29:19, 29:25
**synthetically** [4] - 18:20, 20:25, 21:5, 21:21
**syringe** [4] - 5:18, 5:21, 10:23, 16:11

## T

**table** [6] - 19:14, 19:15, 19:16, 20:16, 20:17, 20:21
**tail** [1] - 12:16

**talks** [1] - 6:19
**tautology** [1] - 16:22
**technique** [2] - 56:4, 56:9
**temperature** [10] - 13:23, 13:24, 14:3, 49:15, 50:2, 50:23, 51:4, 53:12, 53:13
**ten** [3] - 51:4, 59:19, 59:25
**term** [23] - 4:7, 4:9, 17:23, 18:1, 21:24, 22:11, 23:5, 23:23, 24:11, 25:7, 27:16, 30:3, 30:5, 30:18, 30:21, 35:24, 41:19, 41:21, 54:9, 54:11, 57:15
**terms** [12] - 4:7, 13:16, 23:11, 30:18, 31:7, 34:5, 34:7, 37:12, 37:20, 54:14, 57:16, 58:5
**test** [10] - 55:1, 55:4, 56:1, 56:2, 56:24, 57:4, 59:12, 59:13, 59:14
**tested** [2] - 19:17, 51:6
**testimony** [11] - 13:15, 13:16, 14:9, 32:10, 33:9, 34:21, 35:2, 40:24, 45:23, 51:14
**testing** [3] - 36:1, 50:3, 52:22
**tests** [1] - 51:10
**text** [1] - 28:13
**textual** [1] - 16:14
**THE** [53] - 1:1, 1:13, 3:4, 3:7, 3:19, 3:22, 3:25, 4:1, 4:2, 4:12, 4:16, 5:13, 7:8, 7:10, 12:19, 14:13, 14:15, 16:25, 17:22, 18:3, 18:23, 19:1, 22:10, 24:2, 28:3, 30:2, 32:8, 32:13, 33:1, 33:13, 33:19, 40:18, 41:3, 41:5, 41:10, 44:16, 44:25, 45:6, 45:12, 51:22, 53:20, 54:5, 55:8, 57:6, 57:13, 59:17, 59:23, 60:2, 60:4, 60:12, 60:14, 60:17, 60:21
**theirs** [1] - 29:24
**themselves** [2] - 22:25, 39:16
**theory** [2] - 15:3, 15:20

**therapeutically** [1] - 46:14
**thereafter** [2] - 49:18, 50:2
**thereof** [1] - 30:24
**they've** [3] - 5:2, 16:21, 43:24
**thinking** [1] - 57:10
**third** [3] - 6:13, 24:1, 27:5
**three** [12] - 8:8, 28:6, 30:23, 31:2, 37:4, 42:7, 44:4, 47:10, 47:19, 47:21, 51:3
**throughout** [7] - 19:8, 19:22, 20:22, 38:20, 39:10, 52:15, 58:19
**tiny** [1] - 50:11
**title** [1] - 25:15
**together** [2] - 6:18, 36:16
**touch** [2] - 13:14, 37:6
**toxic** [1] - 40:3
**tracks** [2] - 10:15, 10:16
**transcript** [1] - 1:25
**transcription** [1] - 1:25
**transdermal** [1] - 46:16
**transition** [4] - 42:4, 42:10, 42:13, 43:7
**transitional** [7] - 30:5, 30:16, 31:1, 31:5, 42:1, 42:7, 42:9, 42:17, 46:21
**treat** [3] - 35:12, 35:13, 47:13
**treated** [1] - 12:9
**treating** [16] - 36:21, 36:22, 38:10, 39:4, 40:9, 43:19, 44:11, 44:15, 44:22, 46:8, 47:12, 52:13, 56:20, 56:22, 56:23, 57:10
**treatment** [2] - 52:8, 55:6
**Trenton** [1] - 1:11
**Treschan** [1] - 27:19
**trial** [4] - 32:11, 32:22, 33:8
**true** [5] - 10:3, 10:21, 22:6, 37:7, 52:14
**try** [2] - 5:2, 22:24
**trying** [6] - 22:21, 22:23, 23:19, 32:5, 46:20, 56:7
**turn** [4] - 24:21, 24:23, 27:5, 47:21
**twice** [2] - 4:3, 22:5

**two** [19] - 3:25, 9:25, 10:12, 10:18, 18:13, 18:21, 23:6, 25:1, 25:2, 30:11, 31:6, 43:5, 47:10, 47:20, 48:3, 51:19, 53:14, 54:16, 61:2
**two-step** [1] - 43:5
**type** [3] - 18:17, 31:5, 46:20
**types** [1] - 42:7
**typically** [1] - 5:9

## U

**U.S** [1] - 1:10
**U.S.C** [1] - 43:10
**ultimately** [1] - 17:6
**under** [9] - 25:5, 25:6, 27:13, 31:1, 35:6, 37:9, 43:10, 46:2, 59:10
**understood** [5] - 29:18, 30:21, 37:13, 52:5, 56:21
**unexplained** [1] - 44:5
**unit** [13] - 5:21, 10:4, 10:5, 10:7, 10:8, 10:11, 10:18, 10:19, 11:5, 14:20, 30:22, 42:3, 42:13
**United** [1] - 3:2
**UNITED** [2] - 1:1, 1:13
**units** [1] - 14:21
**unless** [1] - 54:3
**unrecited** [2] - 31:11, 31:20
**unusual** [2] - 6:22, 30:6
**up** [6] - 8:10, 14:18, 18:1, 32:16, 32:23, 60:10
**urgent** [1] - 56:22
**US** [1] - 26:18
**uses** [2] - 22:17, 42:4
**USP** [14] - 21:19, 21:21, 26:18, 27:3, 27:11, 29:5, 29:6, 29:7, 29:8, 29:14, 29:15, 29:18, 29:19, 29:23

## V

**vague** [3] - 46:5, 46:18, 47:18
**vaguely** [1] - 44:9
**validly** [1] - 31:8
**variation** [2] - 25:9, 51:4

**variety** [1] - 52:8
**various** [6] - 17:8, 19:5, 21:13, 23:16, 36:1, 52:15
**vary** [2] - 13:16, 50:22
**vascular** [1] - 26:9
**vasoconstrictors** [1] - 23:14
**vasopressin** [110] - 5:7, 8:10, 8:18, 8:23, 9:10, 11:8, 17:3, 18:2, 18:6, 18:15, 18:17, 18:25, 19:7, 19:9, 19:11, 19:14, 19:15, 19:17, 19:20, 19:21, 19:23, 19:25, 20:4, 20:7, 20:8, 20:14, 20:15, 20:17, 20:18, 20:21, 20:23, 20:25, 21:7, 21:15, 21:19, 21:20, 21:21, 21:22, 21:24, 22:8, 22:17, 22:24, 23:7, 23:8, 23:13, 23:20, 23:23, 24:5, 24:7, 24:11, 24:22, 24:23, 25:3, 25:4, 25:9, 25:19, 25:23, 25:24, 26:2, 26:7, 26:8, 26:11, 26:16, 26:17, 26:21, 26:22, 27:3, 27:4, 27:6, 27:7, 27:8, 27:9, 27:11, 27:13, 27:14, 27:15, 27:17, 27:19, 27:20, 27:23, 27:24, 28:18, 29:8, 29:10, 29:12, 29:13, 29:15, 29:19, 30:1, 30:23, 35:10, 35:17, 35:19, 35:20, 36:2, 47:6, 47:13, 50:8, 50:22, 54:21, 56:6
**vasopressin's** [1] - 23:2
**Vasostrict** [1] - 23:4
**vast** [1] - 16:4
**vein** [1] - 8:14
**verbatim** [3] - 44:2, 46:1, 48:24
**version** [4] - 11:19, 11:22, 27:11, 29:14
**vial** [4] - 5:7, 6:11, 15:15, 16:3
**view** [4] - 32:9, 33:18, 34:10, 35:3
**violates** [1] - 28:16
**virtually** [4] - 49:23, 50:6, 50:9, 50:12
**viscosity** [2] - 36:10,

44:7
**visit** [1] - 3:22

## W

**wag** [2] - 12:16, 12:19
**Wallack** [2] - 3:13, 3:18
**WALLACK** [1] - 2:2
**wants** [1] - 47:19
**waste** [3] - 56:19, 57:12
**water** [4] - 6:10, 7:6, 31:1, 35:21
**week** [1] - 49:16
**weekend** [2] - 4:3, 60:22
**weeks** [3] - 5:8, 6:12, 15:17
**weigh** [1] - 17:8
**weighed** [1] - 51:17
**welcome** [2] - 3:19, 3:22
**well-reasoned** [1] - 4:13
**Weston** [1] - 13:19
**whatnot** [1] - 33:18
**whereas** [1] - 54:13
**wherein** [2] - 15:11, 52:10
**white** [1] - 19:20
**whole** [3] - 6:18, 19:24, 28:16
**widget** [9] - 55:8, 55:9, 55:10, 55:11, 55:12, 55:13, 55:16, 55:18
**wishes** [1] - 32:17
**withstanding** [1] - 53:1
**woefully** [1] - 53:9
**word** [4] - 5:4, 12:7, 16:25, 22:4
**words** [4] - 7:25, 9:17, 26:1, 26:25
**works** [1] - 21:10
**world** [4] - 7:1, 8:1, 8:12, 9:9
**worry** [1] - 32:11
**worse** [1] - 35:22
**writing** [1] - 9:5
**written** [1] - 59:19

## Y

**year** [2] - 26:20, 60:13
**yellow** [3] - 10:1, 11:2, 58:8
**young** [1] - 3:18

## Z

**zero** [1] - 50:3